# WHEELING.

## CALWELL'S EX'R v. PRINDLE'S ADM'R *et al.*

## LILLY'S ADM'R v. CALWELL'S EX'R *et al.*

Submitted January 19, 1882.   Decided May 6, 1882.

1. The declarations to a third person, of a trustee in a deed of trust upon land made to secure the payment of money due from the deed of trust debtor to his creditor, that the debt so secured has been paid, cannot be received as evidence against the *cestui que trust* as tending to prove the payment or non-existence of the trust-debt or for the purpose of estopping the *cestui que trust* from asserting his debt against the property covered by said deed of trust, where the trustee has not executed said deed of trust by sale thereunder. The power of the trustee over the legal estate vested

in him exists only for the benefit of the *cestui que trust.* Generally in a court of equity no act or negligence of the former can prejudice the latter.    (page 639.)

2. A legal presumption of payment of a bond or covenant given for the payment of money does not arise from mere lapse of time, where the bond or covenant has not been due for twenty years before commencement of suit or proceedings for the recovery of the amount thereby due and payable.    If a shorter period even a single day less than twenty years, has elapsed, the presumption of satisfaction from mere lapse of time does not arise.    (p. 639.)

3. While the mere lapse of twenty years without explanatory circumstances affords a presumption of law, that the debt is paid, even though it be due by specialty, still the payment may be inferred by the court or jury from circumstances with the lapse of a shorter period of time than twenty years.    (p. 640.)

4. When an action or proceeding is based upon a bond or covenant for the payment of money, if twenty years elapse between the time of its becoming due and the commencement of the action or proceeding, the defendant may without pleading the statute of limitations rely upon the presumption of payment; and upon issue joined on plea of payment payment may be inferred by the court or jury from circumstances coupled with a lapse of a shorter period than twenty years.    (p. 640.)

5. On the 3d day of February, 1863, near nine months after the Legislature of the reorganized government of Virginia had given the consent of Virginia to the formation of the new State of West Virginia, and some time after Congress had passed an act giving its consent to the formation of the new State of West Virginia, and providing for its admission into the Union as one of the United States, upon conditions precedent expressed, the General Assembly of Virginia passed an act entitled "An act transferring to the proposed State of West Virginia, when the same shall become one of the United States, all this State's interest in property, unpaid and uncollected taxes, fines, forfeitures, penalties and judgments, in counties embraced within the boundaries of the proposed State aforesaid." This act contains seven sections, and the seventh and last section thereof provides, that "This act shall take effect, when the proposed State of West Virginia shall become one of the United States." The said proposed State became one of the States of the United States on the 20th day of June, 1863. HELD:

   I. That the said act of the General Assembly of the reorganized government of Virginia was not void, because the State of West Virginia was not in existence as one of the United States at the time of its passage.    (p. 648.)

   II. That said act did take effect and become operative for the purposes of its enactment on the said 20th day of June, 1863. And although the Legislature of the State of West Virginia did not by an act in express terms "accept the said Virginia act," yet the Legislature did by clear implication derived by acts touching the subjects of said Virginia act accept the said Virginia act (if any acceptance were necessary to make the said act effective for its purposes).    (p. 648.)

III. Under the circumstances, under which said Virginia act was passed, considering its purposes and character, it should be considered, that it became operative and effective for its purposes and objects on the 20th day of June, 1863, unless it appears, that the State of West Virginia on that day or afterwards dissented from or refused to accept the provisions of said Virginia act expressly or by implication. (p. 649.)

6. The State of Virginia upon notices and motions by the name of "The Commonwealth" instituted and prosecuted by the auditor of public accounts on the 6th day of March, 1860, recovered two several judgments against Edmund S. Calwell "in the circuit court of Richmond" as one of the securities of John E. Lewis, late sheriff of Greenbrier county, the one being for $4,893.92, the balance of the land property, and capitation and September license taxes of 1854 due from said John E. Lewis, late sheriff of Greenbrier county, with interest thereon to be computed at the rate of six per centum per annum from the 17th day of January, 1855, until paid, and the costs of the motion, $13.44, and the other being for $1,073.86, the balance of June, 1855, license taxes, due from said John E. Lewis, late sheriff of Greenbrier county, with interest thereon to be computed at the rate of six per centum per annum from the 20th day of June, 1855, until paid, and $161.07 for damages thereon according to law, also the cost of the motion, $11.94. The law in force at the time said notices were given and motions made and judgments were rendered provided, that "the auditor of public accounts shall institute and prosecute all proceedings proper to enforce payment of money to the Commonwealth – that the proceeding may be in the circuit court of the city of Richmond—that when it is at law, it may be by action or motion—that "every judgment on any such motion shall be in the name of the Commonwealth." And the city of Richmond being the capital of the State of Virginia, as judicially known to the court, HELD:

I. That each of said judgments is a valid judgment of the State of Virginia against said Edmund S. Calwell rendered in and by the circuit court of the city of Richmond, Virginia. though in the name of the Commonwealth, "Commonwealth" under and by virtue of the law standing for and representing the State of Virginia for all purposes, of which all persons were bound to take notice. And the "circuit court of the city of Richmond" standing for and meaning the circuit court of the city of Richmond under and by virtue of the law, of which all persons were also bound to take notice. Chapter 42, Code of Virginia, 1860, sections 1, 2 and 4. (p. 651.)

II. That each of said judgments with their liens passed to and became vested in the State of West Virginia under and by virtue of the said act of the General Assembly of Virginia, passed February the 3d, 1863, on the 20th day of June, 1863. (p. 651.)

III. That each of said judgments belonged to the State of Virginia with their liens until the said 20th day of June, 1863. (p. 651).

IV. The said judgments and each of them were and continued to be positive liens in favor of the State of Virginia upon all the lands of

the said Edmund S. Calwell in the State of Virginia, including those in the county of Greenbrier, now of the State of West Virginia, from the time of their rendition until the said 20th day of June, 1863. (p. 651).

V.  That by virtue of the said Virginia act of February the 3d, 1863, the said judgments with their said liens upon the said lands of said Edmund S. Calwell on the said 20th day of June, 1863, passed to and belonged to the State of West Virginia, and said judgments on the date last aforesaid became and from thence continued to be positive liens in favor of the State of West Virginia upon the lands of said Edmund S. Calwell within the limits of the State of West Virginia, including his lands in the said county of Greenbrier.  (p. 652).

VI.  That said judgments did not cease to be liens upon the lands of said Calwell within the State of West Virginia, upon the last named State becoming one of the States of the Union, to-wit, on the 20th day of June, 1863, nor did the liens of said judgment upon the lands of said Calwell within the State of West Virginia in any wise become discharged or released by the State of West Virginia becoming one of the United States.  (p. 654.)

VII.  The statute of limitations did not commence to run against the State of Virginia as to said judgments for any purpose prior to the 20th day of June, 1863, when they with their liens passed to the State of West Virginia.  (p. 651.)

VIII.  The statute of limitations did not commence to run against the State of West Virginia for any purpose by virtue of her laws as to said judgments until the 1st day of April, 1869.  (Code of 1868, chapter 35, section 20.)  (p. 651.)

7.  *Quære:* Does the statute of limitations run against the lien of a judgment upon the lands of a judgment-debtor, created by statute, in any case?  (p. 653).

8.  The "authenticated abstract" of a judgment mentioned and referred to in section 4 of chapter 186 of the Code of Virginia of 1860, in relation to docketing judgments is answered and fulfilled by presenting to the clerk of the county court an attested copy of the judgment in lieu of an "authenticated abstract" of the judgment; such copy of a judgment answers substantially for all purposes the requirements of said fourth section, and includes all that an abstract could show and more.  (p. 664.)

9.  The said two judgments were docketed in the clerk's office of the county court of Greenbrier county by the clerk thereof, in the name of "the Commonwealth against Edmund S. Calwell," on the 29th day of September, 1860, in the judgment lien docket kept in the clerk's office of said county court for the purpose of docketing judgments under the fourth section of said chapter 186 of said Code of 1860.  Said judgments as docketed plainly show the date and the amount of each judgment and the date of the docketing of each judgment and the amount and date of each credit.  But the judgment was not indexed in the name of the defendant, Edmund S. Calwell.  HELD:

I. That under chapter 186 §§ 4, and 8, of the said Code of 1860, indexing was not a necessary part of the docketing of the judgment; the docketing is complete without the indexing for the purpose of preserving the liens of the judgments upon the real estate of the said judgment-debtor in Greenbrier county, as against a purchaser thereof for valuable consideration without notice. (p. 667.)

II. That said docketing of each of said judgments as aforesaid preserved the lien of each of said judgments upon the real estate of said Edmund S. Calwell, in the county of Greenbrier, in favor of the State of Virginia, as against a purchaser thereof for valuable consideration without notice until the 20th day of June, 1863, and preserved the lien of each of said judgments upon the real estate of the said Edmund S. Calwell, in the said county of Greenbrier, in favor of the State of West Virginia, as against a purchaser thereof for valuable consideration without notice, on the said 20th of June, 1863, and from thence forward.

10. The said fourth section of chapter 186 of the Code of 1860, in so far as it relates to the quality of a judgment docket book, is directory. (p. 666.)

11. As a general rule, where a statute directs certain proceedings to be done in a certain way, and the form does not appear essential to the judicial mind, the law will be regarded as directory, and the proceedings under it will be held valid, though the command of the statute as to form has not been strictly obeyed, the manner not being the essence of the thing to be done. (p. 666.)

12. The liens of said two judgments upon said lands were in no wise impaired or discharged by any of the provisions of the Code of this State of 1868, such judgment-liens upon such lands being accrued rights, were not intended to be affected by said Code. (Sections 1 and 2 of chapter 176 of the Code of 1868.) (p. 663.)

Appeal from and *supersedeas* to a decree of the circuit court of the county of Greenbrier, rendered on the 20th day of November, 1878, in two causes heard together in said court then pending, in one of which E. S. Calwell's executor was plaintiff, and P. A. Prindle's administrator and others were defendants, and in the other of which James Lilly's administrator was plaintiff, and E. S. Calwell's executor and others were defendants, allowed upon the petition of George Lee and others.

Hon. Homer A. Holt, judge of the eighth judicial circuit, rendered the decree appealed from.

HAYMOND, JUDGE, furnishes the following statement of the case:

The said case of E. S. Calwell against P. A. Prindle's

adm'r, *et als.*, during the life of said Calwell was before this Court in the name of said *Calwell* v. *P. A. Prindle's adm'r et als.*, and was decided on the 10th Sept. 1877, and is reported in the 11th vol. W. Va. 307. The opinion of the Court contained in said report contains quite a full statement of the case as then presented and the disposition the Court then made of the case. It will be seen by reference to said opinion, that the circuit court of Greenbrier county in June, 1876, by its decree ascertained and determined, that the claim of defendant, Mathews, administrator of P. A. Prindle deceased in the bill and proceedings mentioned, was not a subsisting debt and perpetuated the injunction theretofore granted in the cause enjoining and prohibiting the sale of the trust-property conveyed in trust by said E. S. Calwell to Joel McPherson on the 10th day of February, 1860, by deed to secure among others a debt to the said P. A. Prindle of $777.00. The said Alexander Mathews, administrator as aforesaid, and Joel McPherson, the trustee, were alone made parties to this bill. It will be further seen by reference to the said opinion, that this Court reversed the said decree of said circuit court rendered in said cause in June, 1876, and remanded the cause to said circuit court with instructions to permit the plaintiff to file an amended bill making new and additional parties to the cause in accordance with the opinion of this court, if he should ask permission to do so in such time, as the court shall deem reasonable; and that if the plaintiff shall fail to file such amended bill in such time, as said circuit court should deem reasonable, then the said court should dissolve the injunction awarded in the cause and dismiss the plaintiff's bill at his costs; and that if the plaintiff should file such amended bill, leave was given him to take and file further depositions of witnesses upon the subject of the payment and the existence or non-existence of said Prindle debt, that question being reserved and left open for further inquiry and consideration, and for such other and further proceedings to be had in the cause in said circuit court, as should be in accordance with the rules and principles governing courts of equity.

When the cause went to the circuit court of Greenbrier county, the plaintiff filed an amended bill making new and additional parties in accordance with the opinion of this Court

upon that subject. James Lilly filed a bill in said circuit court against said E. S. Calwell and a number of other parties to enforce the lien of a judgment in his favor against said E. S. Calwell recovered in the clerk's office of the county court of said county of Greenbrier on the 28th day of May, 1877 by confession for $610.00, with interest thereon from the 25th day of May, 1877, till paid and the costs of suit against the realty of said Calwell in said deed of trust mentioned; and in his bill among other things he alleges the execution of said deed of trust and the trust creditors therein named, and he claims, that the debts secured by said deed of trust have been paid, &c. He afterwards filed amended bills.

It appears that on the 16th day of November, 1877, the said circuit court made and entered in the said causes of *James Lilly* v. *E. S. Calwell et als.* and *E. S. Calwell* v. *P. A. Prindle's adm'r et als.* a decree in these words:

" Upon the petition of the State of West Virginia, it is made a party defendant in these suits, with leave to answer; and it is ordered, that the said petition be taken, filed and treated as an answer to the original bill in the first and to the amended bill in the second of these causes; and the plaintiffs replied generally; and it appearing from said answer that the following persons are the vendees or grantees of E. S. Calwell for certain lands, upon which the debts, or some of the debts, against him are subsisting liens, viz: Elizabeth Smith, Caroline Maxwell, Anthony Holmes, Peter Holmes, Henry Parsons, The Board of Education of White Sulphur District, David Norris, Sally Norris, James E. Scott, Claiborne Smith, James Allen, Lucy Maxwell, Lucy Jane Gunnell and Nancy D. Tillman and Augustus Wilson, it is ordered that the said plaintiffs amend their bills and make the said vendees or grantees parties thereto, which is accordingly done, and process is awarded against such of them as are residents, and an order of publication is directed against such as are non-residents of the State; and it is further ordered, that James Withrow, the commissioner, to whom the first of these causes has been referred, ascertain and report all the real estate now owned by E. S. Calwell, its quantity, extent and location; and also all real estate heretofore owned and aliened by him, which is bound by any of the liens to be reported by said

commissioner, by which of said liens it is bound, with their priority, and the order, in which such lands must be subjected for their payment, and the quantity and location of said lands; and the said commissioner is authorized to employ a surveyor to aid him in ascertaining any facts upon'which he is directed to report, and to make a plat of said lands."

Alexander F. Mathews, administrator of said P. A. Prindle, deceased, filed his answer to the bill of said Lilly, in which he says, that his intestate P. A. Prindle died in the year 1861, and that he qualified as administrator of his decedent in 1876. He says, it is true, that the defendant E. S. Calwell by the trust-deed dated February 10, 1860, in the said bill mentioned and set out secured among other debts a debt to said Prindle of $777.00 with interest thereon from February 10, 1860, and by an express covenant in said deed agreed and bound himself to pay off and fully discharge said debt on or before two years from the said 10th day of February, 1860; but it is not true, and this respondent expressly and distinctly denies the allegation of plaintiff, that the said debt has been paid off in whole or in part.   On the contrary he alleges, that the said debt still remains due and wholly unpaid.  He also says and avers, that on the —— day of ——, 1876, the said Calwell obtained from the judge of the said court an injunction to restrain and prevent an enforcement of said deed and a sale of the property thereby conveyed to satisfy said debt alleging that it had been paid; that he attempted to prove such payment, which was denied by respondent in his answer to said injunction-bill, and the said court at its May term, 1876, overruled the motion of respondent to dissolve said injunction and perpetuated it; that from this decree an appeal was allowed and the case thereby taken to the Supreme Court of Appeals, where the said decree was reversed and the said proof of payment held to be wholly insufficient, which all appears from the record and proceedings had in the said suit of *E. S. Calwell* v. *Prindle's adm'r et als.* both in this court and the Appellate Court, which are referred to and prayed to be taken and read as a part of his answer.  He also denies, that the said debt is in any respect or for any reason invalid, &c., &c.

The said petition of the State of West Virginia so filed as

aforesaid is as follows: "State of West Virginia, Greenbrier county, ss.: In the circuit court of said county, *James Lilly*, *plaintiff*, v. *E. S. Calwell et al., defendants, E. S. Calwell, plaintiff*, v. *P. A. Prindle's adm'r et al., defendants.* In chancery. To the Hon. Homer A. Holt, Judge of the said court: The petition of the State of West Virginia respectfully represents that heretofore, to wit, on the 6th day of March, 1860, two judgments were rendered by the circuit court of the city of Richmond, Virginia, in favor of the Commonwealth of Virginia against E. S. Calwell, one for $4,893.92 with interest thereon from the 17th day of January, 1855, subject to a credit of $78.03 as of October 27, 1856, and $13.44 costs; the other for $1,073.86 with interest from June 20, 1855, and $161.07 damages, and $11.94 costs; that the said judgments, on the 29th day of September, 1860, were regularly docketed on the judgment lien docket of the said county of Greenbrier, in the office of the clerk of the county court thereof, as will fully appear from duly certified copies of said judgments from said docket herewith filed and prayed to be taken and read as parts of this petition ; that to the said judgments, upon the petition of the said Calwell, writs of error with supersedeas were awarded by the Supreme Court of Appeals of Virginia, and at the April term of said Court of Appeals, in the year 1867, judgments were rendered affirming said judgments of the said circuit court, as reported in 17th of Gratton's Reports, p. 391, and soon thereafter executions upon said judgments were issued from the clerk's office of said circuit court and have never been returned ; that by an act of the General Assembly of the State of Virginia, passed at an extra session held at Wheeling, now in this State, on the 3d day of February, 1863, the said judgments were transferred to your petitioner, the State of West Virginia.

"Your petitioner further represents, that the said judgments rendered, docketed, affirmed and transferred as aforesaid still remain due and wholly unpaid ; that they constitute a lien upon all the real estate of the said defendant, E. S. Calwell, which is sought to be subjected to sale, by the two above entitled suits, and are entitled to be paid out of the proceeds thereof when sold ; that in addition, they are liens upon various tracts and parcels of land owned by the said Calwell at

the time they were rendered and docketed as aforesaid, a list of which is herewith filed, marked "X Y," and prayed to be taken and read as a part of this petition, and which have been since aliened, sold and conveyed by the said Calwell, to the following persons and corporations, viz: Elizabeth Smith, Caroline Maxwell, Anthony Holmes, Peter Holmes, Henry Parsons, Board of Education of White Sulphur township, David Norris and Sally Norris, James E. Scott, Claiborne Smith, James Allen, Lucy Maxwell, Lucy Jane Gunnell, Nancy D. Tillman, Caroline Tillman and Augustus Wilson, and he is advised that resort may be had, if necessary, to these lands to satisfy said judgments in the inverse order of their alienation, after exhausting the real estate now held and owned by the said Calwell.

"And your petitioner is informed, and charges also, that these lands thus sold and aliened, or some of them, are bound by other lien debts against the said Calwell. In consideration of the premises, your petitioner prays, that it may be made a party defendant in the two above named suits, which are to be heard together; that leave be given to file an answer to the original bill in the first and to the amended bill in the second of said causes; that this petition be taken, read and treated as such answer; that in any decree that may be rendered subjecting said real estate to sale, the priority of the lien of the said judgments may be preserved, their payment provided for and the interests of your petitioner fully protected; that the plaintiffs in said suits may be required to amend their bills and make the said vendees or grantees of the said E. S. Calwell parties thereto; that the commissioner, to whom the first of said causes has been already referred, be required in addition to the directions already given him to ascertain and report all the real estate now owned by the said Calwell, its quantity, extent and location, and also all real estate heretofore owned and aliened by him, which is bound by any of the liens to be reported by said commissioner, by which of said liens it is so bound, with their priority, and the order in which such lands must be subjected for their payment, and the quantity and location of said lands; that leave may be given to said commissioner to employ a surveyor to aid him in ascertaining any facts, upon which he is directed to report, and

to make a plat of said lands if he desire it, and that your petitioner may have such other relief as it is entitled to in the premises. And as in duty bound it will ever pray, &c."

The following are the copies certified from the judgment-lien docket in said petition mentioned and referred to :

"GREENBRIER COUNTY COURT CLERK'S OFFICE, TO-WIT :

In the Circuit Court of the City of Richmond, March 6th, 1860.

"The Commonwealth against Edmund S. Calwell, one of the sureties of John E. Lewis, late sheriff of Greenbrier county, defendant.—First case upon a motion instituted and prosecuted by the auditor of public accounts : This day came again the attorney general on behalf of the Commonwealth, as well as the defendant, by his attorney. Whereupon the defendant offered a plea of *non est factum*, and the truth thereof being proved by his oath, the said plea is received, and the defendant having put himself upon the country, the attorney general on behalf of the Commonwealth doth the like, and the said attorney general on behalf of the Commonwealth, and the defendant by his attorney, agreeing that a jury for the trial of the issue in this motion shall be dispensed with, and that the whole matter of law and fact shall be submitted to the court for its judgment thereupon, and the evidence and arguments of counsel being fully heard, the opinion of the court upon said motion is for the Commonwealth. Therefore it is considered by the court that the Commonwealth recover against the defendant $4,893.92, the balance of the land, property, and capitation and September license taxes of 1854, due from John E. Lewis, late sheriff of Greenbrier county, with interest thereon to be computed after the rate of six per centum per annum from the 17th day of January, 1855, until paid, and the costs of this motion subject to a credit of $78.03, paid 27th October, 1856. Commonwealth's costs $13.44.

"A copy teste :             JAMES ELLET, *Clerk.*

"Docketed September 29, 1860.

"A true copy from *the judgment-lien docket* as it now remains in the clerk's office of Greenbrier County Court.

" MARK L. SPOTTS, *Clerk*"

"THE STATE OF WEST VIRGINIA, GREENBRIER COUNTY COURT'S CLERK'S OFFICE TO-WIT : In the Circuit Court of the City of Richmond, March 6, 1860.

" The Commonwealth against Edmund S. Calwell, one of the sureties of John E. Lewis, late sheriff of Greenbrier county, defendant.—Second case upon a motion instituted and prosecuted by the auditor of public accounts. This day came again the attorney general, on behalf of the Commonwealth, as well as the defendant, by his attorney. Whereupon the defendant offered a plea of *non est factum*, and the truth thereof being proved by his oath, the said plea is received, and the said defendant having put himself upon the country, the attorney general, on behalf of the Commonwealth, doth the like, and the said attorney general, on behalf of the Commonwealth, and the defendant, by his attorney, agreeing that a jury for the trial of the issue in this motion shall be dispensed with, and that the whole matter of law and fact shall be submitted to the court for its judgment thereupon, and the evidence and arguments of counsel being fully heard, the opinion of the court upon the said motion is for the Commonwealth. Therefore it is considered by the court, that the Commonwealth recover against the defendant $1,073.86, the balance of June, 1855, license taxes due from John E. Lewis, late sheriff of Greenbrier county, with interest thereon to be computed after the rate of six per centum from the 20th day of June, 1855, till paid, and $161.07 for damages thereon according to law; also the cost of this motion. Commonwealth's costs, $11.99.

"A copy teste : JAMES ELLET, *Clerk.*"
"Docketed September 29, 1860."

"A true copy from the judgment lien docket as it now remains in the clerk's office of Greenbrier county court.
"MARK L. SPOTTS, *Clerk.*"

The following certificate appears in the record as it is before us, viz: "I, Mark L. Spotts, clerk of the county court of the county of Greenbrier and State of West Virginia, do certify that the two judgments, copies whereof are hereto attached, were copied from one of the books kept in this office, which though old, is substantially bound and well preserved for so old a book; that said book was used for docketing judgments from August 16, 1843, to May 15, 1861, and I find one judgment docketed therein the 1st day of May, 1866; that there is in the office no other book kept during that time

or period for such purpose; that no judgments were docketed in this office from May 15, 1861, until February, 1866, from which time another book was commenced and used for that purpose; that the said first book was always treated and used in the office as a judgment lien docket, and always exhibited as such to any persons wishing to see such a docket for the time which it covers; and copies from said book were always furnished to persons desiring them certified as from the judgment lien docket, the two judgments aforesaid are indexed as follows: The space in the index under the letter C is filled up and run out just where the column for E begins, and then where the "C" space ends, and before any indexing under "E," is this note, "See after J," and upon the page after the letter "J" in the said index the indexing under "C" is resumed, and after thirty-nine entries in letter "C" the following are found: *Commonwealth* v. *Calwell,* E. S. 81. *Same* v. *Same,* 81.               "Mark L. Spotts, *Clerk.*

This certificate appears in the record immediately after the said two copies from the judgment lien docket. An agreement, which appears to be signed by the counsel of the parties in the 'court below, appears in the record as before and is as follows:

" *James Lilly* v. *E. S. Calwell et als., E. S. Calwell* v. *P. A. Prindle's adm'r et als.* Agreement.

" It is agreed and admitted that in and by the circuit court for the city of Richmond, on the 6th day of March, 1860, two judgments were rendered in favor of the Commonwealth of Virginia against E. S. Calwell, one for $4,893.92, the balance of the land, property, capitation and September license taxes of 1854, due from John E. Lewis, late sheriff of Greenbrier county, with interest thereon at the rate of six per centum per annum from the 17th day of January, 1855 until paid, and the costs, $13.44, subject to a credit of $78.03, paid October 27, 1856; the other for $1,073.86, the balance of June license taxes due from John E. Lewis, late sheriff of Greenbrier county, with interest thereon at the rate of six per centum per annum from the 20th day of June, 1855, until paid, and $161.07 for damages thereon according to law, and. the costs, $11.94, as fully set forth in the copies from what purports to be a judgment lien docket of Greenbrier county,

filed with the petition and answers of the State of West Virginia in the above entitled cause. And it is further agreed, that this agreement shall be read and considered in evidence on the trial of the above named causes with the same effect and have the same weight that transcripts of said judgments and of the record of the proceedings, in which they were rendered, properly certified and duly authenticated would have from the said circuit court of the city of Richmond."

There appears in the record as before us a certificate which is filed with the answer of Trueman Skinner as exhibit " T. S," which certificate is as follows: "I, Mark L. Spotts, clerk of Greenbrier county court, do hereby certify that the two judgments hereto attached were copied by me from an old book found in my office, in which a number of abstracts of judgments were recorded prior to June, 1861, and no entries of any kind have been made in said book since said date except one abstract of a judgment, which was entered therein May 1, 1866, and perhaps a few releases. There is nothing on the back of said book, or any where in it to show what it is intended for except the abstracts copied in it, though the said book has always been recognized as a 'Judgment Lien Docket.' The index is in much confusion and the two judgments aforesaid are not indexed therein except as follows: On the page, where the names commencing with 'E' are indexed, which is the page following the letter 'C,' is this note: '*See after* J;' and on that page the following entries appear: *Commonwealth* v. *Calwell, E. S.*, 81; *Same* v. *Same*, 81. And neither of said judgments are docketed in any other book or indexed in any other form except as just stated. There is, however, a book kept in this office entitled by label on the cover 'Judgment Lien Docket,' in which all abstracts of judgments, which have been docketed in this or the recorder's office since February 3, 1866, appear, but the judgments aforesaid are not docketed in this latter book so far as I have been able to find by a careful examination of the index of said judgment lien docket.

" MARK L. SPOTTS, *Clerk.*"

To the reading of this certificate of said Spotts as evidence the said Prindle's administrator excepted in writing for several reasons stated in the exception.

A copy of the last will and testament of said P. A. Prindle was filed with the answer of Truman Skinner as an exhibit and is as follows:

"Being of sound and disposing mind, memory and understanding, but fully impressed with the uncertainty of life, I, Parrott A. Prindle, do make, constitute, appoint, publish and decree this to be and as my last will and testament, hereby revoking and annulling all previous wills and testaments:

"Item 1st. It is my desire that my executors hereinafter named shall, as soon as practicable, pay of all just debts which I may owe.

"Item 2d. I hereby give and devise to my man-servant, Esau Read, in fee my house and lot now occupied by Lydia Hicks, in the said city of Washington, located on Third street, in that part of the city known as the 'Island,' (and for a more particular description of which I refer to the land records of Washington county, District of Columbia,) and as the said Esau Read has by indenture yet to serve me some years, I hereby release and discharge him, the said Esau Read, from all further service, and do request and authorize my executors to furnish him with such evidence of this release and discharge as I would have to furnish him, had he fully completed his term of service.

"Item 3d. I give and bequeath to my friend William Wilkinson my horse 'Garibaldi,' now in possession of and training by Mr. Belcher. I further give and bequeath to him, the said William Wilkinson, the unexpired lease of the house I occupy in the said city of Washington, located on Pennsylvania avenue, and known as number 406, together with all the furniture in said house, with the exception of the silver ware which I shall hereinafter otherwise dispose of. The said furniture (with the exception above mentioned) I give to said Wilkinson in fee simple.

"Item 4th. I desire and hereby authorize my executors to to dispose of at public auction the slaves which I may own at the date of my death. This I do because the laws of Virginia do not permit whom I shall hereinafter name as my residuary legatee to *acquire* title to such property.

"Item 5th. All the rest and residue of my estate and property, real, personal and mixed (including the silver ware men-

tioned and reserved in *item 3d* of this will, and also the proceeds of the sale of my slaves mentioned in item 4th of this will) I give, devise and bequeath in fee simple to my most faithful and kind nurse and dear friend, Septemia Barrett (a free woman of color), of Charlottsville, Virginia, to have and to hold the same to her, the said Septemia Barrett, her heirs, executors, administrators and assigns forever.

"Item 6th. Lastly; I do hereby nominate, constitute and appoint my friends, Charles S. Wallack and William Wilkinson of the city of Washington, District of Columbia, to be and act as executors of this my last will and testament. In testimony whereof, I have herewith subscribed my name and affixed my seal this second day of November, A. D. 1860.

P. A. PRINDLE.  [Seal.]"

"Signed, sealed, published and declared by the said Parrot A. Prindle, the above named testator, to be and as and for his last will and testament, in the presence of us, who at his request and in his presence and the presence of each other have subscribed our names and seals as witnesses thereto.

"THO. MILLER.        [Seal.]

"CORNELIUS BOYLE.    [Seal.]

"M. ASHFORD.         [Seal.]"

" *District of Columbia, Washington County, to wit:*    *Orphans' Court, May* 11, 1861.

"This day appeared Thomas Miller and Mahlon Ashford, two of the subscribing witnesses to the foregoing last will and testament of Parrot A. Prindle, late of Washington county aforesaid, deceased, and severally made oath on the Holy Evangels of Almighty God that they did see the testator therein named sign and seal this will; that he published, announced and declared the same to be his last will and testament; that at the time of so doing he was, to the best of their apprehensions, of sound and disposing mind, memory and understanding, and that they together with Cornelius Boyle, the other subscribing witness, respectively subscribed their names as witnesses to this, in the presence and at the request of the testator and in the presence of each other.

"Teste:          ED. N. ROACH, *Register Wills."*

Then follows a certificate of the Register of Wills of the

District of Columbia, Washington county, that the foregoing is a true copy of the original will of Parrot A. Prindle, deceased and the probate thereto filed and recorded in the office of the Register of Wills for Washington county aforesaid &c.

It appears, that on the 13th day of May, 1861, letters testamentary of all the goods and chattels, &c., of said Parrott A. Prindle were by the orphans' court of the District of Columbia granted to Charles S. Wallack of said District, &c. It also appears, that on the 21st day of September, 1861, a certified copy of the said last will and testament of said Parrott A. Prindle, deceased, was by the Hustings court of the city of Richmond on motion of Septemia Barrett, the residuary legatee under the will, ordered to be recorded as a will of real and personal estate, and Charles S. Wallack, one of the executors in the said will named, having refused in open court to take upon himself the burthen of the execution thereof, and William Wilkinson, the other executor in the said will named, being a non-resident of the State of Virginia, the last named court appointed on the day last aforesaid James Miner curator of the estate of said Parrott A. Prindle deceased, &c.

It also appears, that in the vacation of the Greenbrier county court on the 7th of February, 1876, the clerk of said county court appointed the said Alexander F. Matthews administrator of said Prindle deceased. It would seem that the said last will of said Prindle was never admitted to record in this State nor a copy thereof. If it was, the fact does not appear in the record. It appears, that James Lilly, plaintiff in one of these suits, died after the commencement of his suit, and that on the 14th day of June, 1878, said suit was by order of said circuit court revived in the name of his administrator, Michael Riley.

It appears, that on the 2d day of November, 1877, another order of reference was made in the first of these causes by said circuit court referring the cause to commissioner James Withrow with directions to take, state and report an account therein showing in his said report the amount of the subsisting debts due the several creditors in the bill mentioned, which constitute liens upon either the real or personal property of the defendant, Calwell; also any other subsisting debt not referred to in said bill, if any there be, which constitute a lien,

and which may be produced and proved before him; also whether the lien is upon real or personal property, or both, and if on personal property, what has become of it, and in whose possession it remains; and directing said commissioner to report the priorities of the respective debts upon the fund or the several funds, if there be more than one, on which said lien may operate; and also that he ascertain what payments, whether partial or full, have been made upon any of the debts, which are embraced and provided for in the deeds of trust and upon any judgment hereinbefore referred to with any other matter deemed material by himself or required by any of the parties, &c., &c.

The commisioner in his report dated in the caption thereof, January 7th, 1858, says, that E. S. Calwell, on the 10th day of February, 1860, executed a trust-deed to Joel McPherson on a tract of land, known as the Dry Creek property, with the hotel and its appurtenances containing two hundred and fifty acres more or less; one tract, known as the Berth place, containing nine acres; the first named tract joining the White Sulphur Springs tract and the Berth tract one and a half miles south of Dry creek on the Sweet Springs road all in the county of Greenbrier; and in addition a considerable amount of personal property consisting of slaves, horses, cows, all the furniture in the hotel, &c.; that this deed was recorded on the 10th day of February, 1860, and was executed to secure a large number of debts due from E. S. Calwell to persons whose names are mentioned in the said deed, and amongst them is found the debt of P. A. Prindle deceased for $777.00. The commissioner reports, that the debts to Norris, Calwell & Co., and Stearn & Calwell, in said tract mentioned, were collected the one by execution the 1st of May, 1872, and the other in September, 1871.

From all the facts in the case the commissioner concludes, that all the debts mentioned in the said trust-deed are paid except the Prindle debt and the debt to Samuel Tuckwiller, which Prindle debt is claimed by the administrator of Prindle deceased to be yet due. And the commissioner allows said Prindle debt and said Tuckwiller debt upon the property conveyed in said deed of trust as the first preferred. The commissioner reports as next in order according to date, the debt

claimed in the petition of the State of West Virginia. This debt he reports consists of two judgments rendered by the circuit court of Richmond, Virginia, on the 6th day of March, 1860: the first for $4,893.92 with interest from the 17th of January, 1855, and 13.44, costs subject to a credit of $78.03 paid 27th Oct. 1856; the second, a judgment rendered on the same day by the same court for $1,073.86 with interest thereon from the 20th day of June, 1855, and $161.07 damages and $11.94 costs. And these judgments constitute the second class of liens upon the realty. The commissioner further reports, that both of these judgment-debts were rendered against said E. S. Calwell as one of the sureties of John E. Lewis, sheriff, of Greenbrier county, and were docketed on the judgment lien docket of said Greenbrier county, on the 29th day of September, 1860, and that these judgments constitute the second class. The commissioner also reports various other deed of trust and judgment lien debts and their respective priorities; but he reports them to be subsequent in priority to the said deed of trust debt due said Prindle's estate and the said judgment liens of the State of Virginia. The commissioner reports as liens first in priority and of equal priority:

1st. Debt due P. A. Prindle's adm'r secured by trust deed
of the 10th of February, 1860............................... $777.00
Interest on same from February 10, 1860 to June 1, 1878, 853,38 ————
$1,630.38

2d. Debt due to Dr. S. Tuckwiller in same deed..........$180.00
Interest on same to June 1, 1878............................ 202.50 ————
$382.50

And as liens of second class second in priority the said two judgments in favor of the State of Virginia, now for the benefit of the State of West Virginia, which he ascertains to amount on the 1st day of June, 1878 in the aggregate including interest to the sum of $14.406.82. The commissioner ascertains the aggregate of all the lien-debts to be $32,394.51. The commissioner then proceeds to report the real estate owned by said E. S. Calwell at the date of the report, and what has been sold and conveyed by him since the 10th day of February, 1860. He also reports a list of the lands conveyed by said Calwell since the said 10th day of February, 1860 in the order of the date of the deeds and the names of the persons, to whom made, there being sixteen in number, aggregating in

quantity sixty-seven acres and sixty-nine and three-fourths poles. The commissioner further reports, that all the said lands (including these conveyed by said Calwell since the 10th of February, 1860) are bound by the trust deed executed to Joel McPherson, trustee, February 10, 1860, and that all of said lands are bound by the said judgment-liens now claimed by the State of West Virginia and reported as class No. 2, &c. &c.

The defendants Truman Skinner, Susan M. Constable, and the plaintiff E. S. Calwell filed exceptions in writing to the said report upon the following grounds:

"First—It treats and allows the debt aggregating as of June 1st, 1878, $1,630.38, in favor of Prindle's administrator, and the debt of $382.50 in favor of Tuckwiller, as existing and unsatisfied debts: I. The said debts have each been paid. II. The law presumes they have been paid from the lapse of time and the facts and circumstances proven. And III. They are stale demands, and a court of equity will not enforce them or either of them against these exceptants, who are creditors and *bona fide* purchasers for value of the lands sought to be subjected to the payment of said demands.

Second—The said report improperly allows the two judgments aggregating $14,406.82, in favor of the State of West Virginia, and reports them as liens upon the lands sought to be sold in these causes. These exceptants deny, that said judgments are liens upon said lands, or that the State of West Virginia has any title to or right to collect the same because:—
I. The said judgments were rendered in a jurisdiction foreign to this State. II. They were never legally docketed in Greenbrier county where said lands lie. III. They are stale and presumed in law to have been paid, and a court of equity will not under the circumstances and proof in these causes enforce their payment against exceptants, who are creditors and *bona fide* purchasers for value without notice of the lands sought to be subjected to their payment; and IV. There is no law or contract transferring said judgments to the State of West Virginia. The statute relied on by the State was passed before this State had any existence. To create a valid transfer there must be in existence a transferee as well as a transferrer, and there must be a *concurring assent* of both parties;

and if the State of Virginia ever had any lien by virtue of these judgments, it was lost by the legislation of West Virginia on June 6, 1878."

It seems, that said E. S. Calwell about this time died, and his death was suggested ; and the first named of these causes was revived in the name of Lee George, his executor, to be prosecuted in his name; and the plaintiff in the second of said causes amended his bill and made the said executor of E. S. Calwell, and his heirs, and Caroline Maxwell, alias Tillman, as devisee under the will of said E. S. Calwell, parties defendant thereto. It also appears, that on the 3d day of September, 1878, in vacation the judge of said court made an order referring the said cause to said commissioner Withrow with instructions—I. To take, state and report an account of the administration of said Lee George upon the estate of the said E. S. Calwell, showing what assets have come or should have come to his hands, what disbursements he has made, and what balance, if any, is due from him to said estate ; and II. To take, state and report an account of all debts due and owing from said estate, with their amounts, dignities and priorities; and III. Any other matter to be specially stated deemed pertinent by himself or required by any party, &c. The said commissioner in obedience to the last named decree made his report, dated the 30th day of October, 1878, in which he in effect reports all the lien-debts reported in his former report with two additional ones.

It appears, that on the 30th day of October, 1878, upon the motion of the State of Virginia, by James G. Field, the Attorney General for said State, the State of Virginia, was made a party defendant to these suits with leave to file its answer therein and thereupon its answer was accordingly filed and to it the plaintiffs replied generally. The said answer is as follows :

"The State of Virginia, by James G. Field, Attorney General, asks to be admitted party defendant in the above cause, and to file this her answer, which is prayed to be accepted not only as an answer to the bills in the two causes above named, but also to the petition of the State of West Virginia filed in said causes. This respondent, for answer saith that by virtue of an act passed by the Legislature, at Wheeling, February

3d, 1863, known as "An act transferring to the proposed State of West Virginia, when the same shall become one of the United States, all this State's interest in property, unpaid and uncollected taxes, fines, forfeitures, penalties and judgments in counties embraced within the boundaries of the proposed State aforesaid," all interest, right and title of this respondent to the said judgment became vested in the said State of West Virginia, and this respondent disclaims any interest or title in the said debts, and asks that in pursuance of said act the same shall be paid to the said State of West Virginia. And having fully answered she prays to be hence dismissed.

"JAMES G. FIELD,
"<i>Attorney General for State of Virginia.</i>"

This answer is verified by the oath of the said James G. Field.

It also appears, that the parties by their attorneys by an agreement in writing signed by them "agreed, that E. S. Calwell resided in this State at the time of its formation and continued so to reside until his death, and that the lands sought to be subjected to sale in these suits are all situate within the county of Greenbrier in this State."

Since the said cause of *Calwell* v. *Prindle's adm'r et al.* was heretofore before this court, the deposition of James Lilly, James Withrow, James Perkins, Septemia Barnett, Samuel Tuckwiller and Samuel Price have been taken and filed, and the deposition of E. S. Calwell has been retaken and filed. The answers of a number of persons have been filed and replied to, and several petitions have been filed in the cause, which I deem unnecessary to refer to specially or further for the purposes of this cause. It appears, that on the 20th day of November, 1878, the said circuit court pronounced and entered a decree in these causes as follows:

" All the defendants to the plaintiff's original and amended bills who have not been served with *subpœnas*, or against whom orders of publication have not been regulary taken and executed, and who have not answered, having entered their appearance and still failing to file their answers, the said bills are taken for confessed as to all of said defendants, who have not answered; and these two causes came on to be heard together on the 20th day of November, 1878, upon the

79

original and amended bills, in the first cause, the original and amended bills, the second of which makes the personal representative and heirs at law and devisee of E. S. Calwell defendants in the second of said causes, taken for confessed as aforesaid, upon the papers heretofore read and exhibits, the answers of P. A. Prindle's administrator, Caroline Tillman, David and Sally Norris, Anthony Holmes, Peter Holmea, Freeman Skinner, Henry D. Tillman, Susan M. and Maria M. Constable, the petition and answer of W. D. Blair & Co., the petitions and answers to said bills filed by the States of West Virginia and Virginia, the deposition of Samuel Tuckwiller filed as in his answer replications to said answers, depositions of witnesses, process duly served upon all the home-defendants and orders of publication regularly executed upon all the absent defendants in eavh of these causes, who have not appeared and answered, exceptions to the depositions, the orders and decrees hereinbefore entered and made, the order entered in vacation by consent of parties, the agreement of facts marked "X," signed by all the parties, by their attorneys, the original report of commissioner Withrow filed April 10th, 1878, exceptions filed thereto by Truman Skinner, Susan M. and M. Constable and E. S. Calwell, report of said commissioner Withrow made pursuant to said order in vacation and filed October 8, 1878, to which said exceptions, so far as applicable, are renewed, and the arguments of counsel. On consideration whereof, the Court is of opinion and decides that the said first exception to said reports, so far as it relates to the debt allowed therein in favor of P. A. Prindle's administrator, is not well taken, but so far as it relates to the debt allowed in favor of Tuckwiller, it is well taken. And the Court is further of opinion and decides, that the two judgments rendered by the circuit court of the city of Richmond in favor of the Commonwealth of Virginia, and now claimed by the State of West Virginia in the petition and answers of said States and in the reports of commissioner Withrow filed in these causes, mentioned and exhibited, are such subsisting liens upon the real estate of E. S. Calwell, and that they are such liens upon the real estate in the hands of purchasers aliened and conveyed by the said Calwell after the date, September 29th, 1860, at which said judgments were

docketed in this county, should it be necessary to resort to such aliened lands for their payment, as can be claimed and enforced by the said State of West Virginia, and that said judgments now belong to and are the property of West Virginia, and that the said second exception to said reports of commissioner Withrow should be overruled. It is, therefore adjudged, ordered and decreed that so much of said exceptions as refer to the said debt of Tuckwiller be sustained, and said debt disallowed and excluded, and that said exceptions in all other respects be and they are hereby overruled; and that the said reports of commissioner Withrow, with the exception of the said Tuckwiller debt disallowed and excluded as aforesaid, be and the same are in all respects approved and confirmed; that the creditors whose debts are thus allowed and ascertained in said reports, with the exception of said Tuckwiller, whose debt is disallowed as aforesaid, recover from the estate of the said E. S. Calwell the amounts of their respective debts in the order of priority set forth in said reports, with interest on the aggregate of each of said debts from the 1st day of June, 1878, till paid—that is, that the following creditors recover the following sums, with said interest, and in the following order or classes, viz: Class I, P. A. Prindle's administrator, $1,630.38; class II, the State of West Virginia, $14,406.82; class III, Susan M. and Maria M. Constable, or their assignees, $8,828.00; class IV, George Skinner, $4,460.66; class V, R. P. Lake, $262.49; class VI, John W. Harris, $54.10; class VII, James Lilly's administrator, $651.00; class VIII, Samuel Price, $363.98; class IX, George Skinner, $1,154.58; class X, Samuel Straus, $804.71; and Joseph Hawkins. $186.72; and that the said W. D. Blair & Co. recover the sum of $423.90, with like interest as class XI; that P. A. Prindle's administrator recover his costs in the first of these suits, and the other creditors whose debts have been allowed as aforesaid recover their costs in these suits.

"And then after the foregoing opinion and decision had been given, the defendants, Caroline Tillman, David Norris, Sally Norris, Anthony Holmes and Nancy D. Tillman, asked leave to amend the answers by them heretofore filed in these causes, and leave to do so is granted them accordingly; and

said amendments are now here made, and the plaintiffs reply generally. And at the same time the defendants last named presented the affidavits of John W. Harris, dated November 15, 1878, and Lee George, dated November 9, 1878, and now filed with the papers in these causes, and thereupon moved said court to continue said causes until the next term of this court; and the court is of opinion and decides, that the said motion, so far as the enforcement of said liens against any of said real estate is concerned, shall be sustained, and that no decree shall now be rendered to sell any of said real estate; and it is therefore ordered that said causes to said extent be and they are hereby continued. And it being admitted, that the said real estate of which the said Calwell died seized, and which is the only land bound by the debts hereinbefore decreed to Susan and Maria Constable, or their assignees, and to George Skinner, will be insufficient to pay these debts after the payment of the older and prior liens hereinbefore allowed, and in satisfaction of which it will have to be sold, it is further adjudged, ordered and decreed that Samuel Price, trustee in the deed of trust, which secures the debt, that now belongs to the said Constables, and Alexander F. Mathews, trustee in the deed of trust which secures one of the debts herein decreed to George Skinner and who are hereby appointed commissioness for the purpose, proceed after giving notice of the time, terms and place of sale for four consecutive weeks in the *Greenbrier Independent* to sell the personal property conveyed to them by said deeds, for cash in hand, as to all sums under $25.00, and as to the balance upon a credit of six months, take from the purchaser bonds with good security for the said deferred payments, and report their proceedings to this court. But the said commissioners before receiving any money shall give bond, with security to be approved by the clerk of this court in the penalty of $2,500.00, conditioned according to law ; and they are directed to collect said bonds, to be given as aforesaid, when they become due, and apply the proceeds and the said cash payments to pay—first, the expenses of sale, and then to pay the balance upon the said debts of Susan and M. Constable and George Skinner."

From this decree an appeal to this Court has heretofore been allowed on petition and assignment of error.

*A. C. Snyder* for appellants cited the following authorities:
45 N. Y. 696 ; 2 Day 406 ; 15 N. Y. (Sup. Ct.) 127 ; 27 Gratt.
690–695 ; 11 W. Va. 325 ; 28 Gratt. 348 ; 41 Barb. 635 ; 2
Leigh 719 ; 8 Cranch 1 ; Amb. 645 ; 94 U. S. 806 ; 83 Ill.
171 ; 2 Wash. C. C. 323 ; 10 Johns. 586 ; 9 Gratt. 649 ; 3
Stark. Ev. 1235 ; 11 W. Va. 187 ; 10 Gratt. 300 ; 17 Gratt.
321 ; *Id.* 347 ; 1 Rand. 65 ; 6 Litt. 440 ; Stat. Westm. 13 Ed.
I ch. 18 ; 1 Rev. Code Va. pp. 524–527 Code (1860) ch. 186
§ 6 ; *Id.* § 7 ; 28 Gratt. 428 ; 14 W. Va. 373 ; 25 Gratt. 1 ;
9 W. Va. 616 ; 25 Am. Rep. 760 ; Const. Art. XI § 8 ; Code
ch. 166 § 1 ; *Id.* ch. 139 § 5 ; *Id.* § 7 ; *Id.* § 4 ; 11 How. 165 ;
95 U. S. 722 ; Story Confl. Laws § 539 ; 23 Gratt. 880 ; 14
Wall. 238 ; 37 Wis. 449 ; 20 Ohio 261 ; 22 Wis. 142 ; 11
Wright (Pa.) 141 ; 18 Ia. 1 ; 25 Ia. 184 ; 19 Ia. 248 ; *Id.* 510;
12 Ia. 14 ; 13 Ia. 570 ; 9 Mo. 326 ; Freem. Jdgmt. §343 ; 44
Mo. 309 ; 46 Mo. 472 ; 8 Vt. 172 ; 3 Cranch 155 ; 2 Binn. 40;
8 Serg. & R. 496 ; 17 Serg. & R. 71 ; 30 Wis. 444 ; 1 Story
Eq. Juris. § 404 ; 3 H. & M. 235 ; 11 Gratt. 321 ; 17 N. Y.
469 ; 9 W. Va. 525 ; 1 Par. Cont. 399 ; 2 Lom. Dig. 10 ; 46
Pa. St. 200 ; 1 Pick. 27 ; Acts 1875 ch. 55 § 23 ; Va. Law
Jour. (June 1879) p. 367 ; 3 Pet. 12 ; Ang. Lim. § 197 ; 2
Lead. Cas. Eq. 64 (s. p. 19) ; 17 Gratt. 96 ; 16 Wall. 401 ; 1
Schn. & Lefr. 413, 428 ; 2 Story Eq. Juris. (12th ed.) § 1520;
13 Gratt. 329 ; 12 Gratt. 499 ; 7 Gratt. 112 ; *Id.* 177 ; 20 Gratt.
544 ; 23 Gratt. 212.

*Price & Preston* for the Misses Constable and James S. Lil-
ly's administrator cited Code of Va. (1860) ch. 186 §§ 6, 8 ;
10 Leigh 394 ; 2 Leigh 425 ; 3 Leigh 532 ; Const. Art. XI §
8 ; 7 Wall. 617 ; 11 Wall. 39 ; Const. Va. Art. IV. § 27.

*John W. Harris* for the purchasers under the decree of sale
cited 14 W. Va. 254 ; Code ch. 91 § 1 ; 2 Story Eq. § 1237
and note (1) ; 27 Gratt. 511 ; 1 Story Rep. 478 ; 1 Wash. 336 ;
2 Rand. 6.

*Alexander T. Matthews* for appellees cited the following
authorities: 1 Burr. Law Dict. "Assignee" p. 145 ; 1 Bouv.
Law Dist. "assignee" p. 133 ; 8 W. Va. 218, 230 ; 2 Otto
203 ; 1 Tuck. Com. 410 ; 1 Cranch 259 ; 7 W. Va. 348, 356,
357 ; *Id.* 390 ; 9 Mon. 210 ; 2 Tuck. Com. 436 ; Hill Trus-

tees 282; *Id.* 274; 10 W. Va. 19, 26; Dun. Pal. Agency 164, 165, 310; 2 Greenl. Ev. § 63; Benj. Sales 183; 11 W. Va. 323; 10 W. Va. 145; 12 W. Va. 98; Ang. Lim, ch. 5 §§ 34–41 (n.) 3; 4 H. & M. 57; 8 Leigh 458; 11 Gratt. 572; 1 H. & M. 85; 12 W. Va. 36, 67, 68; 3 Pet. 12; 25 Gratt. 627; Acts Leg. Va. (1862–3) p. 58; *Id.* p. 62; 5 Otto 303, 313; 9 Cranch 292; 2 Pet. 566; 14 How. 268; Acts 1863 p. 266; *Id.* p. 5; Acts 1866 p. 48; *Id.* p. 53; Acts 1865 p. 36; Acts 1866 p. 115; Acts 1867 ch. 100; *Id.* ch. 131; *Id.* p. 88; 8 Leigh 271, 281; 2 Lom. Dig. 6; 4 Kent 504 n. (c.); 2 Rob. New Pr. 11; 44 Barb. 354; 20 Johns. 184; 24 Wend. 280; 6 Cow. 617; 2 Wend. 308; Acts 1875 p. 126; Code Va. (1860) ch. 186 § 4; 14 Barb. 290; 8 N. Y. 67; 6 Hill 646; 7 Hill 9; 1 Burr. 447; Pott. Dwarr. Stat. pp. 222, 228; Code Va. (1860) ch. 42 § 4; *Id.* ch. 176 § 5; Code ch. 130 § 5; 20 Gratt. 617; 1 Rand. 102; Cent. Law. Jour. (April 13, 1877) p. 340; 24 Vt. 388; 44 Miss. 472; 50 Ga. 331; 14 Vt. 14; 10 Ala. 368; 2 Greenl. Crw. Real Prop. 546; 1 Marsh. 225; 5 Gratt. 221; 2 Gratt. 471; 6 Ill. 575; 38 Ill. 252; 3 Stew. & Pal. (Ala.) 298; 1 A. K. Marsh. 306; 1 R. I. 30; 28 Tex. 605; 25 Vt. 273; *Id.* 635; 20 Ohio 261; 23 Gratt. 880; Code Va. (1873) p. 1166; *Id.* p. 666; 15 Wall. 610; Homestead Cases So. Law Jour. Feb. and March 1878; 18 Gratt. 244; 2 W. Va. 441; 28 Gratt. 423, 430; Code p. 735 § 2; 23 Gratt. 266.

HAYMOND, JUDGE, announced the opinion of the Court:

The case of *Calwell* v. *Prindle's administrator* has, as we have seen, heretofore been before this Court. *Calwell* v. *Prindle's adm'r*, 11 W. Va. 307. The case was decided by this Court on the 10th day of September, 1877, and remanded to the circuit court of the county of Greenbrier for further proceedings therein to be had. This Court in the opinion then rendered therein as the opinion of the Court, at page 317, says: "The deposition of David Watts was taken and filed by the plaintiff, but it was excepted to by the defendant, Mathews, as being incompetent and irrelevant; and the Court sustained the exception, I think, properly." Again, at page 320, the Court said: "The deposition of James Cox was also taken and filed by the plaintiff; and the defendant, Mathews, filed exceptions to it as being hearsay, incompetent and irrel-

evant. The court sustained the exception rightly, I think, as the witness only deposed to what other persons had told him ; his evidence is simply hearsay and inadmissible. The plaintiff also took and filed the deposition of Joel McPherson, the trustee, in which he testified, that he is fully persuaded, that the debt referred to was adjusted by E. S. Calwell with P. A. Prindle; but he has no personal knowledge of said adjustment. He also says, that his impression was derived from hearsay, but that Prindle had never admitted to him, that said debt was paid, and that he never saw said Prindle after 1861." Again at page 328 the Court further said : " The deposition of McPherson simply stated an impression derived from hearsay. This deposition neither proves nor tends to prove anything—it is too uncertain and inconclusive in its very nature to be of any efficacy or force as evidence"

Again at page 323 : " At the time the property conveyed by said deed of trust was advertised for sale by the trustee, only about fourteen years had elapsed, since the debt became due and payable. The plaintiff in order to prove payment of the debt caused himself to be examined in his own behalf and, as we have seen, he states in his deposition, that he paid the debt before the expiration of the two years from the date of the trust, and that he paid it with the Thomas order to Prindle, and took up the bond or note, which he had given for the debt, and that during the war the said bond or note was lost or destroyed, as he believes, in the manner stated in his evidence. He further states, he has made diligent search for the bond or note, and has not been able to find it, but that he found said order, which he exhibits with his deposition."

At page 326 : " For the foregoing reasons it seems to me, that no part of plaintiff's deposition given in his own behalf, or to be more explicit, in chief is admissible under the statute, except so much as proves the making and delivery of the Thomas order ; and it cannot therefore be read except as aforesaid in his behalf for any purpose." Again at page 328 : " Under the views I have presented there is no proof of payment of the said debt of $777.00 to Prindle. The only question left for consideration is, whether the lapse of time, between the time the said debt became due, and the time the property was advertised for sale, which was about fourteen

years, in connection with other circumstances appearing in the cause, is sufficient to authorize us to infer or presume, that said debt was paid or satisfied.   There is in fact but one circumstance in the cause entitled to any consideration after excluding the deposition of plaintiff, and that is, the failure and inability of the defendant, Mathews, to produce the bond or note, which plaintiff alleges he made to Prindle for said debt. I have shown that the said note or bond, if ever made, was not material or necessary to prove or establish the plaintiff's debt in this cause.   The copy of the deed of trust filed by plaintiff with his bill as evidence in the cause establishes the debt. The plaintiff seems to have forgotten or overlooked the fact, that said deed of trust contains an express covenant on his part to pay said debt in two years.   Under the circumstances of this case, as it now stands, I do not understand, that the mere circumstance of the inability of the defendant, Mathews, the administrator, to produce the said bond or note, is sufficient in connection with the lapse of time to authorize or justify the inference or presumption, that said debt has been paid.   Indeed in this case, as it is now presented, I do not consider the failure or inability to produce said note or bond, being a circumstance unconnected, as it is, with other circumstances or facts proven or properly appearing bearing upon the question of payment, as being entitled to any efficacy, or as authorizing any reasonable inference or presumption of payment of the debt in question, connected with the lapse of time in this case.   The mere lapse of fourteen years, since the debt became due in this case, unconnected with pertinent circumstances proved, from which an inference of payment of the debt may reasonably be drawn, does not authorize a presumption of payment by a court or jury."

Again at page 330: " Upon the whole it seems to me, that the circuit court erred in its decree of June, 1876, in ascertaining and determining, that the claim of defendant, Mathews, administrator of P. A. Prindle, deceased, from what appears in the cause, is not a subsisting debt, and in perpetuating the injunction theretofore awarded in the cause.   The creditors named in said trust-deed, their assigns or personal representatives, as the case may be, should have been made parties to the bill.   They as well as the plaintiff, if their debts secured

by said trust-deed have not been paid, have the right to con-
test the debt claimed by Prindle's administrator in this cause,
and to have their debts, if existing, paid.  The trustee, Mc-
Pherson, should not have advertised the property in the said
deed of trust mentioned, to be sold to pay the Prindle debt to
the exclusion of the other creditors named in said deed, from
anything that now appears in this case.  If the trustee enter-
tained any reasonable doubt, as to whether the Prindle debt
was paid or not, and did not know certainly, that the other
debts in said deed of trust mentioned were satisfied, or did
not exist, he should not have proceeded to advertise the prop-
erty, or any part of it for sale, until the existence or non-
existence of the said trust-debts, or any part of them, had been
first judicially ascertained; and for that purpose he should
have filed his bill in equity.  The decree rendered in the
cause must be reversed with costs to the appellant and against
the appellee, Edmund S. Calwell, and the cause remanded to
the circuit court of the county of Greenbrier, with instruction
to said court to permit the plaintiff to file an amended bill,
making new and additional parties to the cause, in accordance
with the opinion of this court, if he shall ask permission to
do so in such time, as said court shall deem reasonable; and
if the plaintiff shall fail to file such amended bill in such
time as said circuit court may deem reasonable, then the said
circuit court to dissolve the injunction awarded in the cause
and dismiss the plaintiff's bill at his costs.  And if the plain-
tiff shall file such amended bill, leave is given him to take
and file further depositions of witnesses upon the subject of
the payment, and the existence or non-existence of said
Prindle debt, that question being reserved and left open for
further inquiry and consideration," &c.

A decree of this court was made and entered in the cause in
accordance with the latter part of said opinion last above quo-
ted.  It now appears from the record, that after the cause was
remanded to said circuit court, the depositions of James Lilly
and Samuel Price were taken, and also, the deposition of
plaintiff, Calwell, was re-taken at his instance.  These are
the only additional depositions taken and filed in the cause in
support of the claim, that the Prindle debt has been paid or
does not exist.  The deposition of Lilly proves nothing ma-

terial. The deposition of said Calwell as re-taken and filed is substantially the same as his first deposition, to which I have referred. Samuel Price in his deposition in answer to questions, says, "I have been practicing law as a profession for more than forty years. At the time and just before the execution of the trust-deed to me as trustee to secure the debt mentioned in the deed to Truman Skinner, the said Skinner and E. S. Calwell called on me to examine the clerk's office for incumbrances on the property alluded to. I do not recollect, whether they desired an examination of the title, but believe the title was assumed to be good, if there were no liens upon the property. The time will be shown by reference to the deed. I understood at the time, that Skinner was about to loan Calwell some money to be secured by deed of trust on the property, if the examination, I was to make, proved satisfactory. I went to the office for that purpose and found the deed of trust to Joel McPherson to secure the debt to P. A. Prindle and others, and whilst engaged in the examination I met with said McPherson, who according to my recollection, stated, that Calwell had stated or afterwards stated, that all the debts embraced in that deed were paid. I acted upon that assurance in expressing my opinion to Skinner, which was favorable to the title. I did not find the register of the judgment against Calwell in favor of the Commonwealth of Virginia. Whether I searched for judgments or not I do not now remember."

It is proper to remark here, that on the 9th day of September, 1872, the said Calwell executed to said Samuel Price, trustee, a deed of trust on all the property at Dry Creek, near the White Sulphur Springs in Greenbrier county, where the said Calwell then resided, embracing the tract of land there situate of thirty-five acres more or less, it being (as recited in the deed) all which the said Calwell then owned with the hotel-buildings, cabins, mineral-waters and all the appurtenances and also some personal property in the said deed mentioned, in trust to secure T. Skinner in a debt of $8,000.00, payable in four years with interest from date. This debt is reported in the commissioner's report as being third in priority on realty, &c., and is provided for in the decree of the 20th of November, 1878, as the third class in favor of Susan M. and Maria M.

Constable, the debt having been assigned to them.    This deed seems to have been admitted to record in the recorder's office of Greenbrier county, on the 30th day of September, 1872. The reading of the re-taken deposition of said E. S. Calwell is excepted to by Prindle's administrator, because the deposition of the witness had already been taken and filed once in the suit upon the same matters, concerning which he is now again re-examined, and because it is not competent for the plaintiff to re-examine him without leave of the court, and his testimony as hereinbefore given has been decided by the circuit court as well as the Supreme Court of Appeals to be incompetent.

The plaintiff, Mathews, administrator, took and filed in the cause the depositions of James Withrow, James Perkins and Septemia Barnett.    Withrow in his deposition states in substance, that he is the person, before whom the last deposition of said Calwell was taken; that at the time he did not think Calwell competent to testify, as he regarded him imbecile, at least so much so that he would not have relied upon his testimony; that his (Calwell's) answers were frequently far from the subject, and only when his attention was called to the question, would he begin again to answer, as though he understood what he was about, and before he could get a sentence out, he would wander again, and his attention have to be called to the question ; that only that part of his answers were put down by him, which related to the question or answer.

James Perkins in his deposition states substantially, that he has knowledge of papers, bonds, notes, &c., in the possession of P. A. Prindle at his death, that his aunt, Septemia Barnett, brought the papers from Washington City in the year 1864, and sent them by him to James Minor, who made a list of them in his presence; that he called them out to Minor ; that his said aunt had possession of said papers, when he first saw them, and afterwards James Minor, as before stated ; that said Minor was depot-agent at Charlottsville, Va., and was curator of the estate of P. A. Prindle ; that he, Minor, died on the 26th day of October, 1875.; that there was among said papers a sealed envelope, on which was endorsed " E. S. Calwell ; bond $777.00 ;" that there was no date that he remembers ; that all of Mr. Prindle's valuable papers were in separate

sealed envelopes and properly endorsed ; that he is pretty certain, that said note or bond was destroyed either there or in Richmond in 1865 by the Federal troops ; that his said aunt and he have made during the last twelve months diligent search for the note or bond, and have been unable to find it or any clue to it; that their search was also among Mr. Minor's papers, which were in his possession ; that he was in Mr. Minor's employment for a number of years prior to his death ; that the night before Sheridan's raid through there, Mr. James Minor being absent, his brother, Dabney Minor, and he, witness, got together all of said James Minor's papers they could find, including the Prindle papers, and put them with the desk and safe containing them on the cars and sent them to Richmond ; that they remained in the depot at Richmond till the evacuation of that city by the Confederates, when the Federal troops came in and broke open the desk and safe containing the papers, and destroyed or scattered them in all directions, so that but few of them were found ; that on returning here he found, that the papers of Mr. Minor, which were left here had also been scattered and destroyed by the Federal troops; that there was an inventory made of the debts of said Prindle made by Mr. Minor in his, witness's, presence ; that he has that list made in the handwriting of Mr. James Minor and signed by him, which he filed with his deposition as exhibit " A.; " that he found the inventory with Mr. Minor's papers within the last six months.

The said exhibit " A," filed with said deposition is headed : " Bonds, notes and due-bills belonging to the estate of P. A. Prindle." This exhibit describes twenty-seven notes and bonds on different persons with their amounts and the places of residence of the different debtors, the smallest of which is for $34.00 and the largest is for $20,000.00. In said inventory appears the name of said Calwell thus : "E. S. Calwell, White Sulphur (bond) $777.00." This inventory is signed at the bottom thereof, " James Minor."

Septemia Barnett in her deposition states in substance, that she has knowledge of the papers, bonds and notes of P. A. Prindle in his possession at his death and left by him ; that said Prindle died at her house in 1861, and his papers were left in her possession ; that she carried them to Washington

with his remains and brought them back from Washington in 1864, and sent them by James Perkins to Mr. Minor, who had been appointed curator of Mr. Prindle's estate; that said Minor was depot-agent at Charlottsville, and curator of Prindle's estate, and he died in 1865; that among said papers there was a bond of E. S. Calwell for $777.00, dated February, 1860, to the best of her recollection, and that was one of the bonds turned over to Mr. Minor; that she asked Mr. Minor not to push Mr. Calwell for the money, as he was a friend of Mr. Prindle as well as of hers, and she believed he was hard run for money at that time; that she does not know what became of the bond; that it was supposed to have been lost or destroyed by the Federal troops either here at the time of Sheridan's raid, or in Richmond at the time of the evacuation. Mr. Minor before his death searched for the papers, but could not find the bond, and since his death James Perkins and she have also searched for the bond among Mr. Minor's papers and elsewhere, without success. As to what became of the papers of said Minor including those of P. A. Prindfe's estate in the possession of said Minor she says, she only knows, that the day after Sheridan's raid she went to the depot at Charlottsville and found that papers of Mr. Minor, which had been left there, had been scattered or destroyed by the troops; that she understood from Mr. Minor and James Perkins, that valuable papers had been taken from here to Richmond and there lost or destroyed by the Federals; that James Perkins and she while searching among Mr. Minor's papers for the Prindle bond found the inventory, which James Perkins has already filed with his deposition marked "A"; that the inventory is made off and signed in Mr. James Minor's handwriting.

I remark here that it appears that the Thomas order (which is for $757.35) to which reference has been made appears to bear date August the 30th, 1857; and it now appears, that after the date of that order, to-wit: on the second day of August, 1858, the said E. S. Calwell executed to Benejamin F. Weed and William H. Shanklin, trustees, a deed of trust on the tract of land known as the Dry Creek property and its buildings and appurtenances; also a tract of land known as portion of the Brown survey, a tract of land on the Sweet

Springs road known as the Berth survey, and a tract of land one and one half miles east of White Sulphur Springs on the James river and Kanawha turnpike road, and all the furniture in and about the Dry Creek Hotel, and also horses, cows, farming utensils and one negro woman to secure the sum of $20,000.00 due from said E. S. Calwell to P. A. Prindle, which said sum of $20,000.00 to bear interest from the said 2d day of August, 1858; and the date of the deed of trust to secure the said debt of $777.00 to said Prindle is the 10th day of August, 1860. How the $20,000.00 debt was paid does not appear; but it is not claimed to be due in this suit. It also now appears that on the 29th day of November, 1855 the said E. S. Calwell executed to William H. Shanklin, trustee, a deed of trust on thirty-eight acres of land called Dry Creek and a negro woman and other personal property in, about and belonging to the Dry Creek Hotel to secure among other debts, a debt to P. A. Prindle due by note in the sum of $850 or thereabouts. It also now appears, that on the 4th day of August, 1855, only a few months prior to the date of the last named deed of trust, the said E. S. Calwell made to said Joel McPherson, trustee, a deed of trust on one slave named Sarah, growing crop on the Dry Creek farm, wagons, horses, cows, farming utensils and also all of the household and kitchen furniture belonging to Dry Creek Hotel to secure several debts, among which is a debt to P. A. Prindle of $1,130.00. It does not appear how the two last named debts secured as aforesaid were paid or settled, and neither of them is claimed to be due or unpaid in this suit. The said deed of trust for $20,000.00 was executed in less than one year after the date of said Thomas order; and the deed of trust of the 10th day of February, 1860, for the said $777.00 was executed some two and a half years after the date of said Thomas order; so that said Calwell executed two deeds of trust to secure the two several debts, (including the deed of trust included in this suit) to said Prindle acknowledging two several existing debts of specified amounts after the date of said Thomas order.

It seems to me, that the deposition of said E. S. Calwell as retaken and filed is not competent or proper to be read as evidence in the respects and for the reasons substantially as stated in the opinion heretofore rendered and given in said

·cause of *Calwell* v. *Prindle's adm'r,* 11 W. Va. 307. Nothing has occured in the case since that decision to render said deposition admissible as evidence for any purpose except the part thereof, which, it was then held, might be read.

The declarations of Joel McPherson, the trustee in the said deed of trust of the 10th of February, 1860, testified to by Samuel Price as to the debt being paid, it seems to me, cannot be read as against Prindle or his personal representatives as evidence of the payment or non-existence of the Prindle debt or for the purpose of estopping Prindle or his personal representative from asserting the same against the property covered by said deed of trust. The power of the trustee over the legal estate vested in him exists only for the benefit of the *cestui que trust.* No act or negligence of the former can prejudice or narrow the title of the latter. 3 Ves. 127, 341 ; 2 Fonb. 170; 16 Ves. Jr. 26 ; 1 H. & M. 49. His deed it is true will pass the legal title. 6 Munf. 358, 367. But it will not avail against the *cestui que trust* in equity, except indeed in the single case of an alienation to a purchaser without notice, the trustee being in possession, an event that can scarcely ever occur, since in tracing the title the purchaser would in almost every conceivable instance be led to a discovery of the trust. 1 Mad. 366 ; 2 Fonb. 170 ; 4 Johns. C. C. 138. Should such a case occur, the remedy of the *cestui que trust* would be against the trustee, who would be bound to make good the trust. 2 Fonb. 170, 173 ; See 2 Tucker's Com. side p. 437 ; See also *Wolfe* v. *Bate,* 9 B. Mon. 210; 2d ed. of Hill on Trustees top p. 388, side p. 274, note 1, and cases there cited. It is doubtless true, that for some purposes notice to the trustee is in effect notice to the *cestui que trust.* But from this it cannot be inferred or held, that the *cestui que trust* is bound by the acts or declarations of the trustee, and especially of a trustee of the desription of the one created by the deed of trust of the 10th of February, 1860. Upon the whole it seems to me, that the actual payment of said trust-debt of the 10th of February, 1860, is not proven.

Are the facts and circumstances appearing in the case sufficient to authorize or justify us in presuming the payment of said debt ? A legal presumption of payment of a bond or cove-

nant given for the payment of money does not arise from mere lapse of time, where the bond or covenant has not been due for twenty years before commencement of suit or proceedings for the recovery of the amount thereby due and payable. If a shorter period, even a single day less than twenty years, has elapsed, the presumption of satisfaction from mere lapse of time does not arise. While the mere lapse of twenty years without explanatory circumstances affords a presumption of law, that the debt is paid, even though it be due by specialty, still payment may be inferred by the jury from circumstances with the lapse of a shorter period of time than twenty years. When an action is brought on a bond or covenant for the payment of money, if twenty years elapse between the time of its becoming due and of the institution of the action or proceeding, the defendant may without pleading the statute of limitations rely upon presumption of payment; and upon issue joined in plea of payment payment may be inferred by the court or jury from circumstances, coupled with a lapse of a shorter period than twenty years. *Sadler's adm'r* v. *Kennedy's adm'x*, 11 W. Va. 187; *Hale et al.* v. *Pack's ex'rs*, 10 W. Va. 145; *Perkins adm'r* v. *Hawkin's adm'r*, 9 Gratt. 656; *Goldhawk ex'r &c.* v. *Duane*, 2 Wash. C. C. 323.

As we have seen Charles S. Wallack qualified as executor of said Prindle deceased in the District of Columbia on the 13th day of May, 1861, about the time of the commencement of the late war between the Government of the United States and the Confederate States; and James Minor was appointed curator of the estate of said Prindle deceased by the Hustings court of the city of Richmond on September 21, 1861, which was shortly after said war commenced and three years before its termination; and Alexander Mathews after the termination of the war and after the formation of the State of West Virginia, and after she had extended and enforced her jurisdiction over the said county of Greenbrier; and on the 7th day of February, 1876, was appointed administrator of said Prindle deceased in this State. This appointment of said Alexander Mathews as administrator as aforesaid was according to the principles settled in *Clay* v. *Robinson, adm'r*, 7 W. Va. 348, 356, 357. As we have seen, the deed of trust from said Calwell to Joel McPherson to secure the said debt to said Prindle was exe-

cuted the 10th day of February, 1860; and in said deed of trust
the said Calwell expressly covenanted and agreed, that he
would pay and fully discharge each of the debts mentioned in
said deed of trust on or before the expiration of two years
from the date of said deed.   The deed of trust then did not
mature before the 10th day of February, 1862, after the com-
mencement and during the continuance of the said war, and
from that period until the trustee in said deed at the instance
of said Mathew's administrator advertised the property to be
sold by him under said deed of trust was only about fourteen
years without deducting the period, during which the war con-
tinued, which perhaps under the principles settled by the third
section of the syllabus in the case of *Hale et al.* v. *Pack's ex'rs*,
10 W. Va. 145, should be done in this case.   But I do not
decide that question at this point, as under the view, which I
take of the case, it is unnecessary.

It seems to me without deducting the period of the war
from the said fourteen years, that under the facts and circum-
stances appearing we are not authorized under the law to pre-
sume or infer, that said debt of $777.00 with its interest or
any part thereof, has been paid or had been paid, before the
said Calwell filed his bill of injunction, or the said property
was advertised for sale under said deed of trust by said trus-
tee, and that therefore the said circuit court did not err in
overruling the first exception to the reports of commissioner
Withrow by its decree of the 20th day of November, 1878, so
far as it relates to the debt allowed therein in favor of P. A.
Prindle's administrator.   I am further of opinion because of
the evidence of Samuel Tuckwiller, who was the executor of
David Tuckwiller, that the said court did not err in its said
decree in sustaining said first exception to said reports so far
as it relates to the debt allowed in favor of Tuckwiller.

I now proceed to enquire, whether the said circuit court
erred in overruling the second exception filed to the said re-
ports of commissioner Withrow in and by its said last named
decree.   In order to arrive at a correct understanding and
conclusion upon the questions involved in this proposition, it
is essential to recur briefly to the history and legislation of
the re-organized government of Virginia at the city of Wheel-
ing.   The convention of delegates, which met at the city of

Wheeling on the 11th day of June, 1861, adopted a declaration entitled a " declaration of the people of Virginia;" and on the 19th day of June, 1861, in accordance with the said declaration passed an ordinance for the re-organization of the State-government. It declared that the general assembly elected on the 23d day of May, 1861, and those elected to fill vacancies, who should qualify by taking the oath prescribed by the convention, should constitute the Legislature of the State and assemble at Wheeling on the 1st day of July succeeding. On the 20th day of June in conformity to an ordinance the convention elected a governor and other executive officers for the State. The convention afterwards adjourned to re-assemble on the 1st Tuesday in August thereafter. The first Legislature of the re-organized government of Virginia met at Wheeling on the 1st day of July, 1861.

Pursuant to adjournment the convention re-assembled on the 6th day of August, 1861. On the 20th day of August, 1861, the convention passed an ordinance to provide for the formation of a new State out of a portion of the State of Virginia, by which it was ordained, that a new State, to be called the State of Kanawha, should be formed and erected, including within its boundaries certain counties therein named. At the time of voting on the question of forming this State out of Virginia, the voters were authorized to vote for delegates to a convention to form a Constitution for the government of the proposed State. This convention was authorized to include within the proposed State the county of Greenbrier and other counties named, and such other counties not named as lay contiguous to the counties named, if the said counties or either of them by a majority of the votes given should declare their wish to form a part of the proposed State and should elect delegates to the convention. The governor was required on or before the 15th day of November, 1861, to ascertain and proclaim the result of the vote, and if a majority of the votes given by the counties named should be in favor of the formation of the new State, he was to call the convention in Wheeling on the 26th of November, 1861. The convention was required to frame a Constitution for the new State, and submit it for ratification or rejection to the qualified voters on the 4th Thursday of December following. It was

also made the duty of the governor to lay before the Legislature at its next meeting for its consent according to the Constitution of the United States the result of the vote, if it was found, that a majority was in favor of the new State and also in favor of the Constitution proposed. It was provided, that the new State should take upon itself a just proportion of the public debt of the Commonwealth of Virginia, prior to the 1st day of January, 1861, to be ascertained by charging to it all State expenditures within its limits and a just proportion of the ordinary expenses of the State government, since any part of it was contracted, and deducting therefrom the moneys paid into the treasury of the Commonwealth from the counties included within the new State during the same period. It was also provided, that when the consent of the Legislature to the formation of the new State should be obtained, it should forward the same to the Congress of the United States together with the Constitution and request, that the new State be admitted into the Union. The convention then on the 21st of August, 1861, adjourned ; and unless called by the president or the governor by the first Thursday in January, 1862, it was to remain adjourned *sine die.*

Under the ordinance the vote was taken in August, 1861, and resulted in favor of the formation of a new State. At the same time delegates were elected to the convention to form a Constitution for the new State. The last named convention assembled in Wheeling on the 26th day of November, 1861 ; and after having framed a Constitution, which it directed to be submitted to the people on the 3d day of April, 1862, it adjourned on the 18th day of February, 1862. This Constitution changed the name of the new State from that of Kanawha to that of West Virginia. On the day prescribed the vote was taken on the adoption of the Constitution and resulted in its adoption. The Legislature of the reorganized government of Virginia met in Wheeling in extra session on the 6th of May, 1862, and by an act passed on the 13th of the same month gave its consent as the Legislature of Virginia to the formation and erection of the new State within the jurdiction of Virginia. The act, which passed on the 13th day of May, 1862, giving the consent of the Legislature of Virginia to the formation of the new State required, that the act

together with a certified original of the new Constitution for that State should be transmitted by the executive to the senators and representatives of the State of Virginia with the request to use their endeavors to obtain the consent of Congress to the admission of the State of West Virginia into the Union.

On the 31st day of December, 1862, an act was passed by Congress giving its consent to the admission of the State of West Virginia into the Union, requiring however an amendment to be made in the Constitution of the new State as a condition precedent to its admission. See the act of Congress. The act of Congress declared, that the constitution was republican in form and enacted "that the State of West Virginia be and is hereby declared to be one of the United States of America and admitted into the Union on an equal footing with the original States in all respects whatever, and until the next general census shall be entitled to three members in the House of Representatives of the United States. The act of Congress further provided : "that whenever the people of West Virginia shall through their said convention and by a vote to be taken at an election to be held within the limits of the said State at such time, as the convention may provide, make and ratify the change aforesaid and properly certify the same under the hand of the president of the convention, it shall be lawful for the President of the United States to issue his proclamation stating the fact, and thereupon this act shall take effect and be in full force on and after the date of said proclamation."

By reason of this action of Congress the convention reassembled on the 12th day of February, 1863, made the change required on the 17th of the same month, referred the question to the people for ratification or rejection, the vote to be taken on the 26th day of March following. The vote was taken at the appointed time, and the Constitution as amended was ratfied. The result was certified by the president of the convention to the President of the United States ; and in compliance with the act of Congress his proclamation was issued on the 19th of April following, declaring the fact, and that at the expiration of sixty days thereafter the new State of West Virginia would constitute one of the States of the Union. The convention prior to its adjournment in February, 1863, provi-

ded that if a majority of the votes cast at the election in March should be in favor of the adoption of the amended Constitution, then an election should be held on the fourth Thursday of May to choose members of both branches of the Legis,ature, a governor, &c.   This election was held; and on the 20th day of June, 1863, the State of West Virginia became one of the States of this Union.

The 8th section of the 8th article of the Constitution of the State of West Virginia provides, that "An equitable proportion of the public debt of the Commonwealth of Virginia, prior to the first day of January in the year one thousand eight hundred and sixty-one, shall be assumed by this State; and the Legislature shall ascertain the same, as soon as may be practicable, and provide for the liquidation thereof, by a sinking fund sufficient to pay the accruing interest and redeem the principle within thirty-four years.   On the 3d day of February, 1863, some nine months after the Legislature of the reorganized government of Virginia had given the consent of Virginia to the formation of the new State of West Virginia and some time after Congress had passed said act, the General Assembly of Virginia passed an act entitled "An act transferring to the proposed State of West Virginia, when the same shall become one of the United States, all this State's interest in property, unpaid and uncollected taxes, fines, forfeitures, penalties and judgments, in counties embraced within the boundaries of the proposed State aforesaid," which act is as follows:

"1. *Be it enacted by the General Assembly of Virginia,* That all property, real, personal and mixed, owned by or appertaining to this State, and being within the boundaries of the proposed State of West Virginia, when the same becomes one of the United States, shall thereupon pass to and become the property of the State of West Virginia, and without any other assignment, conveyance, transfer or delivery than is herein contained; and shall include among other things not herein specified, all lands, buildings, roads and other internal improvements, or parts thereof situated within the said boundaries, and now vested in this State, or in the president and directors of the boards of the literary fund, or the boards of public works thereof, or in any person or persons, for the use of this State to the extent of the interest and estate of this

State therein ; and shall also include the interest of this State, or of the said president and directors, or of the said board of public works, in any parent bank or branch doing business within the said boundaries ; and all stocks of any other company or corporation, the principal office or place of business whereof is located within the said boundaries standing in the name of this State or of the said president or directors, or of the said boards of public works, or of any person or persons, for the use of this State.

"2. *Be it further enacted,* That all unpaid and uncollected arrearages of taxes on lands, town lots, property tax, capitation tax, license tax, militia fines, fines imposed by courts, forfeitures and penalties, belonging to the State in the hands of the sheriffs, collectors or individuals, in any or all of the counties embraced within the boundaries of the proposed State of West Virginia, as also all bonuses on the capital stock of any bank, taxes on the dividends declared by any bank, savings institution or insurance company; dividends on stock owned by the State, or by the board of public works, or the president and directors of the board of the literary fund, in any bank, bridge, or other corporation in any one of the counties aforesaid ; also taxes on seals, deeds, wills, writs and other legal processes due from the clerks of the courts, notaries public or the Secretary of the commonwealth ; taxes on passengers and tonnage due from railroad companies, taxes on bank notes or other property transported by express companies within the counties aforesaid ; also all fines, forfeitures and penalties incurred by railroads, express companies or other parties or persons within the counties aforesaid ; also all judgments, decrees or penalties incurred by officers of the State, railroad or express companies, or other persons before or since the reorganization of the state government at the city of Wheeling ; also all suits and their results now pending in the name of the board of public works, or of the president and directors of the board of the literary fund in any court of any of the counties aforesaid ; also all taxes on lands, town lots, property tax, capitation tax, license tax, assessed in the counties aforesaid, and due the State for the year eighteen hundred and sixty-three, in the hands of the officers of the State or individuals, together with all the rights of the State, or of the

board of public works, or of the president and directors of the board of the literary fund to any and all money and claims in the counties aforesaid that may not be specifically mentioned in this act, but that rightfully belong to the State or corporations for the use of the State, shall be the property of the State of West Virginia, when the same shall become one of the United States.

"3. It shall be the duty of all sheriffs or collectors of the public revenue, also of all presidents or other officers of railroads, express, bridge or internal improvement companies, presidents and other officers of savings banks and insurance companies, clerks of courts, notaries public, the secretary of the commonwealth, and of individuals owing or having money in their hands due the State, or the boards of public works, or the president and directors of the board of the literary fund, in any of the counties aforesaid, to pay the same into the treasury of the State of West Virginia, when the same shall become one of the United States.

"4. *Be it further enacted*, For the purpose of carrying this act into effect, that suits may be brought in the name of this Commonwealth for the use of the State of West Virginia, when it becomes one of the United States on any bond or claim which shall pass to or become the property of the State of West Virginia by virtue of this act.

"5. *Be it further enacted*, That if the appropriations and transfers of property, stocks and credits provided for by this act take effect, the State of West Virginia shall duly account for the same in the settlement hereafter to be made with this State ; *Provided*, That no such property, stocks and credits shall have been obtained since the reorganization of the state government.

"6. It shall be the duty of the auditor of public accounts, the secretary of state, the treasurer, and the adjutant general of this Commonwealth to procure fit and proper blank-books for the purpose, and cause to be transcribed therein true copies of all such records, official acts, orders, minutes and memoranda, and like copies of original papers upon which any such official action was based, which from its locality or general State interest appertains to and will be useful and advantageous to the State of West Virginia; and the officers afore-

said shall severally certify to the governor of this Commonwealth the correctness of their respective copies ; and it shall be the duty of the governor to certify to all whom it may concern, the official character of such officers so certifying under the great seal of this Commonwealth, and deliver all such copies to the governor of West Virginia, when his election is officially declared for the use of said State of West Virginia.

" 7. This act shall take effect when the proposed State of West Virginia shall become one of the United States."

It is claimed by the counsel for the appellant, that this act was void, because the State of West Virginia was not in existence at the time of its passage. This is claimed upon the common law principle applying to deeds—that there can be no valid deed without a grantee as well as grantor. This principle, I think, cannot be held to apply to an act of the Legislature like this or perhaps acts similar in character. The common law may be modified or repealed by the Legislature in its applicability to a particular subject or matter or act, or generally. It is true that the act never could have been operative, if the State of West Virginia had not become one of the States of the Union ; and it was manifestly intended by the Legislature, that it should not be operative for any purpose, until that event happened. At the time of the passage of the act, as we have seen, the new State was in contemplation, and in fact had advanced far towards becoming a State of the Union ; and the Legislature of Virginia, at Wheeling, evidently considered, that the new State would soon become an accomplished fact. Hence the act was passed with the express provision contained in it, that the act should take effect " when the State of West shall become one of the United States." And in my opinion the act did take effect on the instant the State of West Virginia became one of the States of the Union, which was the 20th day of June, 1863. As well might it be claimed, that the said act of Congress admitting the State into the Union was void and inoperative, because the admission was on its face subject to a condition precedent. I think the Legislature of Virginia had the power to pass the act to take effect, when the contingency therein mentioned happened, and that when the contingency did

happen the act became operative and valid so far at least, as the State of Virginia was concerned.

But it is further claimed, that the act never became operative, until the State of West Virginia accepted it, and that she never did accept it until the passage of the act of the 20th of December, 1875, and the 23d section thereof. This section provides, that " the auditor shall institute all necessary appropriate measures for the collection of all claims for taxes and other demands transferred by the Commonwealth of Virginia to this State by an act of the General Assembly of said Commonwealth entitled 'An act transferring to the proposed State of West Virginia, when the same shall become one of the United States, all the State's interest in property, unpaid and uncollected taxes, fines and forfeitures, penalties and judgments, in counties embraced within the boundaries of the proposed State aforesaid,' passed on the 3d day of February, 1863. Acts of 1875, p. 126. This act does not in express words accept the said Virginia act. It is a direction to the auditor to proceed to collect the claims, taxes, &c.; transferred by said Virginia act. The very language of the act strongly indicates, that the Legislature at the time of its passage regarded the said claims, taxes, &c.," as already transferred to and vested in the State of West Virginia and as being hers by virtue of said Virginia act.

But the said act of 1875 is not the first act, which the Legislature of West Virginia passed in relation to claims, taxes, &c., transferred by the said Virginia act. By the 3d section of an act passed June 26, 1863, it is provided, that "the sheriffs, elected and qualified under the Constitution of this State and the ordinance of the late convention of those counties, in which the taxes for the years eighteen hundred and sixty-one and eighteen hundred and sixty-two, in whole or in part, have not been collected, and where the commissioner's books have not been placed in the hands of a collecting officer, shall proceed to collect and account for the taxes for the years eighteen hundred and sixty-one and eighteen hundred and sixty-two." Acts of 1863, p. 5. This act was passed by the Legislature of West Virginia on the 6th day after she became a State. See also Acts of 1866, p. 48, (asserting her right to Virginia's interest in the Exchange

Bank at Weston). See also Acts of 1865, p. 36, releasing John Slack, late sheriff of Kanawha county, and his sureties from paying a judgment obtained against them in the circuit court of the city of Richmond, bearing date May 10, 1859, for $15,680.40 with interest at twelve per centum per annum and damages and costs for certain taxes and liabilities alleged to be due the State of Virginia from said Slack as sheriff as aforesaid for the year 1857, and from a judgment of same court of like date for $16,068.50 with interest at six per centum per annum and damages and costs for similar taxes and liabilities for the year 1858. See also Acts of 1866, p. 53, whereby the Legislature released the securities of Joshua H. Staats, late sheriff of Jackson county, from all liability to the State of West Virginia including all judgments rendered against them as such sureties in the city of Richmond. See also Acts of 1866, p. 115, (transferring State's interest in roads and bridges to counties). Also Acts of 1867, p. 133, (transferring James River and Kanawha road to counties,) and also Acts 1867, p. 88, (transferring bank-stock in bank at Weston to school-fund.)

From the foregoing acts it is manifest, that the Legislature of this State treated a large part of the property taxes, judgments, &c., transferred to the State by said Virginia act from the beginning as belonging to the State under and by virtue of said Virginia act; and although the Legislature of this State did not by an act in express terms "accept the said Virginia act," yet it is plain, that the Legislature of this State did by clear implication accept the said Virginia act (if any acceptance were necessary) and it must be so considered and held. The said Virginia act making the transfer was clearly beneficial to this State. It seems to me however, that under the circumstances, under which said Virginia act was passed considering its purposes and character it must be considered, that it became operative and effective for its purposes and objects on the 20th of June, 1863, the time, when this State became one of the United States, unless it appeared, that this State then or afterwards dissented from or refused to accept the provisions of said Virginia act expressly or by implication. See as bearing on the subject *Skipwith's ex'rs* v. *Cunningham*, 8 Leigh 271, 281–290. In this case it was held, that

it is not necessary to the validity of a deed of trust, that it should be executed by the *cestui que trust*. The deed operates to pass the legal title so soon as executed by the grantor and the trustees, and can only be avoided by the dissent, express or implied of the *cestui que trust*. A deed of trust conveying land for the benefit of creditors, which is executed by the maker of the deed and the trustees and duly recorded, before a judgment is obtained against the maker, will intercept the lien of the judgment, although the creditors may not have given their assent to the deed until after the judgment. In such case even in a court of equity the equity of the judgment-creditor will generally be considered inferior to the equity of the creditors claiming under the deed. See also *Jackson ex. dem. Pintard* v. *Bodle*, 20 Johns. 184; *Jackson ex dem. Ten Eyck et ux.* v. *Richards*, 6 Cow. 617.

Entertaining these views I am of opinion, that the said two judgments mentioned and referred to in the second exception to the report of commissioner Withrow continued to belong to the State of Virginia until the 20th day of June, 1863, at which time they were by virtue and force of said Virginia act transferred to the State of West Virginia, and she became the owner thereof and has continued to be such owner from thence hitherto.

At the time, when the said judgments were rendered, the county of Greenbrier and all the other counties within the State of West Virginia were part and parcel of the State of Virginia and constituted a part and parcel of her jurisdiction as a State, and they so continued, until West Virginia became one of the United States. As soon as said judgments were rendered, they became by operation of law liens upon all of the real estate of said Calwell deceased in the said county of Greenbrier. Code of Va. of 1860 ch. 53 § 6. No statute of limitations could or did run against the State of Virginia as to said judgments certainly prior to the 20th day of June, 1863; for the statute law of Virginia provided, that no statute of limitations, which shall not in express terms apply to the Commonwealth, shall be deemed a bar to any proceeding by or on behalf of the same. Code of 1860 ch. 42 § 23. This however was the settled law in the absence of such statute-law. Angel. on Lim. 6th ed. ch. 5 §§ 34, 35, 36, 37 and

cases there cited in notes ; *Nimmo* v. *Commonwealth,* 4 H. & M. 57 ; *Gore* v. *Lawson,* 8 Leigh 458 ; *Levasser* v. *Washburne,* 11 Gratt. 572 ; *Kemp* v. *Commonwealth,* 1 H. & M. 85 ; *City of Wheeling* v. *Campbell,* 12 W. Va. 67, 68. The Code of Virginia of 1860 so far, as not repugnant to the Constitution of this State and not amended or repealed by the Legislature, continued to be law in this State until the Code of 1868 of this State took effect on the 1st day of April, 1869.

At the time the said judgments became transferred to this State, no statute of limitations had commenced to run against them and could not for any purpose, as we have seen, and they were severally liens upon the lands of said Calwell, deceased, in the said county of Greenbrier, whether docketed or not. When and after the said judgments became transferred to this State, no statute of limitations could or did run against them so as to effect her interest and rights therein for any purpose for the same reasons, that no statute of limitations could or did run against them before the transfer until the period hereinafter mentioned. In *Glover* v. *Wilson,* 6 Barr (Pa.) 290, it was held, that "where a bond was given as a security by a collector of taxes, and his liability on the bond for the county-rates has been barred by the statute of limitations, but that for State-taxes remains, under a general plea of the statute he and his sureties are liable for both county and State-taxes." In this case the judge, who delivered the opinion of the court, at page 293 says: " As against the county alone we think the plea of the statute would be an effective bar ; for a collector of public taxes is a public officer, and as the cause of action upon this bond accrued at the end of three months from the delivery of the tax-duplicate to him more than seven years had elapsed before the commencement of this action. But the county is not the only party beneficially interested in the bond. As we have seen the Commonwealth has also an equitable title to the security afforded by it, and an interest in the action instituted upon it. Now it is settled, that on grounds of public policy statutes of limitations do not extend to the Commonwealth, unless she be expressly named and her rights waived ; and this, whether it be in the case of a personal action against a surety in an official bond, or entries on land, or other like cases ; and in personal

actions it matters not whether the suit be in the name of the Commonwealth or in the name of some person for her use; for it is not the form of the action that is to govern the operation of the statute. *Commonwealth* v. *Baldwin*, 1 Watts. 54; *Ramsey's Appeal*, 4 Watts. 71; *McKeehan* v. *The Commonwealth*, 3 Barr 151. Nor does it, I conceive, make any difference that another party may also be interested in the securtiy taken in part for the use of the State," &c.

This continued to be the law in this State in reference to the statute of limitations as against the State, until the Code of 1868 of this State took effect. The 20th section of chapter 35 of this Code provides, that "every statute of limitations, unless otherwise expressly provided, shall apply to the State, but as to claims heretofore accrued the time shall be computed as commencing when this chapter takes effect." The said chapter 35 did not take effect until the 1st day of April, 1869, and neither at the time of the order of reference made in this cause to ascertain and report the liens, nor at the time the petition of the State of West Virginia was filed in these causes setting up and claiming said judgments as liens on the lands of said Calwell involved in this suit and claiming the benefit thereof, were the said judgments barred by the statute of limitations. The said petition of the State of West Virginia was filed in these causes on the 16th day of November, 1877, not ten years after the said 20th section of chapter 35 took effect. At the time this State filed its said petition in these causes, she could have brought an action of debt in the circuit court of the county of Greenbrier in the name of the Commonwealth of Virginia for her use for the recovery of said judgments; and no statute of limitations in force in this State could have barred a recovery upon said judgments for the amounts thereof; sufficient time had not elapsed under the provisions of said 20th section of chapter 35.

Entertaining the foregoing views it is my opinion, that neither at the time of the order of reference made in these causes to report the liens on the lands of said Calwell nor at the time of the filing of the said petition in these causes by this State were said judgments barred by the statute of limitations, so as to prevent a recovery therefor by this State in an action of debt. Although under the said 20th section of said

chapter 35 the statute of limitations as to the revival of judgments rendered in this State in favor of the State or to the right to issue executions thereon or to recover therefor in an action at law, may operate as a bar it is gravely maintained and has been held in some of the States, I believe, that the statute of limitations does not operate to bar the enforcement of a judgment-lien in a court of equity, but as I do not deem it material or necessary to decide that question in these causes under the views I entertain in relation to them, and as that question has not been specially argued by the counsel in these causes, I deem it unnecessary to express any opinion now on that question.

But it is claimed by the counsel of the appellants, that the said judgments ceased to be liens within the limits of this State on the 20th day of June, 1863, and that said judgments were not docketed and indexed in the clerk's office of the county court of Greenbrier county, so as to preserve their liens upon the real estate of the said Calwell as against a purchaser thereof for valuable consideration without notice. For convenience I propose to consider both these questions in connection with each other. Chapter 186 of the Code of Virginia of 1860 provides as follows: "3. In the following section, the word "judgment" shall include any bond or recognizance which has the force of a judgment. 4. The clerk of each county and corporation court shall keep in his office, in a well-bound book, a judgment docket, in which he shall docket without delay any judgment in this State, when he shall be required to do so by any person interested, on such persons delivering him, if the judgment be not in his court or office, an authenticated abstract of it. In such docket there shall be stated in separate columns the date and amount of the judgment, the date of docketing it, the alternative value of any specific property secured by it, and the amount and date of any credits on the judgment with the names, description and residence of the parties, so far as they appear in his office or in such abstract. Every judgment shall, so soon as it is docketed, be indexed in the name of each defendant therein. If a clerk fail to do anything required of him by this section, he shall pay a fine of not less than thirty nor more than three hundred dollars to any person, who will

prosecute therefor. 6. Every judgment for money rendered in this State] heretofore or hereafter against any person shall be a lien on all the real estate, of or to which such persons shall be possessed or entitled, at or after the date of such judgment, or if it was rendered in court, at or after the commencement of the term at which it was so rendered, except as follows: 7. A judgment rendered before the commencement of this act shall as against a purchaser or creditor, claiming under a deed made or judgment obtained before the day of such commencement, or as against the heirs or devisees of a person dying before that day, affect no more of such real estate, than would have been liable thereto under the laws in force on the day before this chapter takes effect. 8. No judgment shall be a lien on real estate as against a purchaser thereof for valuable consideration without notice, unless it be docketed according to the third and fourth sections of this chapter in the county or corporation, wherein such real estate is, either within a year next after the date of such judgment, or ninety days before the conveyance of such estate to such purchaser. 9. The lien of a judgment may always be enforced in a court of equity," &c.

At common law, lands of the debtor could not be taken to satisfy his debts except judgments due the King ; and judgments therefore did not operate as *liens* on land. But by the statute of Westm. 2, 13 Edw. I, ch. 18, substantially adopted in Virginia, (1 Rev. Code, ch. 134, § 1, pp. 524—527), a new execution was provided, the writ of *elegit*, by which a moiety of the lands of the debtor could be subjected to the satisfaction of the judgment. The statute however did not in *express* terms give the lien on the land. It provided for the writ, and prescribed the form of it. By its terms the officer was required to deliver to the creditor all the goods and chattels of the debtor, saving the oxen and beasts of his plow, and also a moiety of all his lands and tenements whereof the debtor at the day of obtaining his judgment was seized or at any time afterwards, by reasonable price and extent to have and to hold the said goods and chattels to the creditor as his own proper goods and chattels, and the said moiety as his freehold, to him and his assigns, until that of the judgment be satisfied, (" until he shall have levied thereof the debt and dam-

ages aforesaid.") It was the judicial construction given to this writ, that the judgment was said to be a *lien* on the land. The *lien* resulted from the mandate of the writ to *deliver* to the creditor by reasonable price and extent a moiety of all the lands and tenements of the debtor, whereof he was seized at the date of the judgment or at any time afterwards. The *lien* was an incident of the writ and depended for its existence and continuance upon the capacity to sue out the writ. As long as this capacity lasted, even although revived after being temporarily suspended, the lien continued, and whenever it finally ceased, the *lien*, which was dependent upon it, was extinguished. Perhaps while a judgment was capable of revival, the judgment might have been enforced. As the mandate of the writ extended to all the lands and tenements, of which the debtor was seized at the date of the judgment or at any time afterwards, it was by force of this mandate also, that the *lien* of the judgment overreached all subsequent conveyances, although made to purchasers for valuable consideration without notice of the judgment, and extended to all the lands of the debtor within the jurisdiction of the State.

In the interest and for the protection of such purchasers, the act of March 3, 1843, was passed, which provided for the docketing of judgments; and further that "no judgment, decree or bond or recognizance thereafter rendered, should bind the land of any party to the same against a *bona fide* purchaser for valuable consideration without notice, unless the same should be docketed in the county or corporation, in which the land lay, within twelve months after the rendition or forfeiture of such judgment, decree, bond, or recognizance, or ninety days before such land shall have been conveyed to such purchaser." Except as thus modified in respect to purchasers by the act of 1843 the *lien* of the judgment continued the same in all respects as to its nature, extent, and the mode of enforcing it until the general revision of the laws of 1849, when the law was enacted substantially, as I have quoted it from the Code of 1860. Up to that time as we have seen, it was a mere incident of the writ of *eligit*, resulting by construction from the mandate of the writ, and dependent for its existence and continuance on the capacity to sue out the writ. It was now made for the first time as to judgments thereafter to be

rendered an express, direct, positive, absolute *lien* on *all* the *real estate*, of or to which the judgment-debtor should be *possessed* or entitled at or after the date of the judgment, or if it was rendered in court, at or after the commencement of the term, at which it was so rendered, with the same qualification as to purchasers for valuable consideration without notice, as was made by the act of 1843. The lien of the judgment being now express, positive and in no way dependent upon the *eligit*, and the remedy in equity being performed in practice, the *eligit* soon fell into disuse and was finally abolished by the Legislature of Virginia. Code of Va. of 1873, ch. 183, § 26 p. 1175. It was also abolished in this State by the Code of 1868. Code of W. Va. ch. 140 sec. 2.

"It," says Judge Burks in *Borst* v. *Nalle et als.*, 28 Gratt. 430, "can hardly be said of such a *lien* as we have described, that it is not a 'civil right,' and one of a high order; seeing that it is under the law, as it stands, and by force of the law a plain, direct, postive *charge* upon real estate. Having once attached it continues, unless it is in some way discharged, as long as the real estate, on which it rests, remains the property of the judgment-debtor. It accompanies the land in its descent to the heirs, follows it into the possession of volunteers, and even into the hands of purchasers for value, if they have, or even if they do not have notice, *provided* the judgment is docketed in the manner prescribed by law. It is a mistake to suppose, that the 8th section of chapter 186 of the Code of 1860 was intended to *create a lien* against the purchaser by docketing the judgment. The *lien* is *created* by section 6, and attaches to all the real estate of the debtor except so far, as it is qualified by section 8. The qualification is, that it shall not extend to real estate aliened after judgment to purchasers for value, who have no notice of the judgment, *unless* the judgment be docketed in the manner and within the time prescribed. The implication is irresistable, that if so docketed, it shall be a lien; that the *lien,* which was created by section 6, shall *continue* as to such purchasers." *Borst* v. *Nalle et als.*, 28 Gratt. 423, 428, 429, 430, 431; *Taylor's adm'r* v. *Spindle*, 2 Gratt. 44, 69; *Renick* v. *Ludington et al.*, 16 W. Va. 367, 373, 374, 375, 376.

In the case of *Gatewood's adm'r* v. *Goode et als.*, 23 Gratt,

880, the syllabus as far as herein given is, that "at the March term, 1871, of the county court of Monroe county, a judgment was rendered at the suit of the *Bank of Va. plaintiff* v. *W. S. and G.* the latter living in the county of Bath. Execution of *fi. fa.* was issued on this judgment and levied on the property of W., and the sheriff returned, after June, 1861, a levy upon the personal property of W., that the property was appraised and offered for sale, and not bringing valuation it was returned. G. died during the war leaving real estate in Bath county and also in West Virginia; and after his death some of his creditors filed their bill in the circuit court of Bath, to subject his real estate to the payment of his debts. The commissioner reported the above judgment as a debt by judgment having priority. A copy of the judgment was certified by the clerk of Monroe circuit court 'and as such keeper of the records of my office.' The circuit court confirmed the report. *Held* 1: The judgment constituted, as between the parties thereto, a lien on the real estate in Virginia belonging to the judgment-debtors or any of them, whether the said judgment-debts or any of them were docketed in the counties, in which the real estate might be, or not.  *  *  3. That the lien of said judgment on the lands of G. in Bath county was neither lost nor impaired by reason of the division of the State of Virginia into two States and the falling of the county of Monroe into the State of West Virginia." The opinion of the Court authorizes this syllabus.

In this case it was claimed by the counsel for the appellant, that for the purposes of the suit, as it stood in the court below, the said judgment could not be regarded as a judgment of the State of Virginia, but should be regarded as a judgment of a foreign State, &c., as it is claimed in the case at bar by counsel for appellants. The 8th section of the 11th article of the Constitution of this State of 1863 provides, that " such parts of the common law and of the laws of the State of Virginia as are in force within the boundaries of the State of West Virginia, when this Constitution goes into operation and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the Legislature," &c. The plain effect of this constitutional provision was to continue in force from and after the time, when this State became

one of the United States, chapter 186 of the Code of 1860 hereinbefore quoted from until altered or repealed by the Legislature of this State. We have seen, that the said two judgments were liens upon the said Calwell's lands in the county of Greenbrier on the 20th day of June, 1863, when they passed to this State by virtue of the said Virginia act. Did they cease to be such liens at the time they so passed to this State? These judgments were certainly domestic judgments *quoad* the people and territory embraced within the limits of this State at the time, when they were rendered. They were not rendered in a jurisdiction foreign to them, for they at the time of the rendition thereof were a part and parcel of the territory and people of the State of Virginia. It is not pretended, that the court, which rendered the judgments, had not jurisdiction and authority to render them. The 42d chapter of the Code of Virginia of 1860 provided: " 1. The auditor of public accounts shall institute and prosecute all proceedings proper to enforce payment of money to the Commonwealth. 2. The proceeding may be in the circuit court of the city of Richmond. When at law, it may be by action or motion." These provisions of law were in force, when these judgments were rendered by the circuit court of the city of Richmond, and these judgments were rendered against said Calwell as a surety for a sheriff of Greenbrier county in his official bond given before the county court of said county for the default and failure of said sheriff to pay over taxes, &c., collected by him as sheriff of said county, and which were due from the said sheriff to the Commonwealth of Virginia.

These judgments are based and founded upon contract and the failure to comply with such contract, and I apprehend, that until said judgments were reversed, set aside, annulled or perpetually enjoined by competent authority, or discharged or released in some lawful way, they continued to be liens upon the land of said Calwell in the county of Greenbrier not only up to the time this State became one of the United States, but afterwards. If a judgment rendered in the county of Monroe (which is one of the counties of this State) before the division of the State of Virginia into two States continues to be a lien upon the realty of the judgment-debtor in Bath

county, Virginia, after the division under said chapter 186 of the said Code of 1860, as, we see, was held by the Court of Appeals of Virginia, why and on what principle will not a judgment rendered in the circuit court of the city of Richmond in the State of Virginia before said division continue to be a lien after the division upon real estate of the judgment-debtor in Greenbrier county within this State under the provisions of said chapter 186 of said Code of 1860? Suppose the two judgments in question had been rendered against the said Calwell by a court of competent jurisdiction in the county of Greenbrier before the said division, would the judgments have continued liens against the lands of Calwell after the division? I apprehend it cannot successfully be denied, that they would. Still such judgments would not have been rendered by one of the courts of the State of West Virginia, but by a court of the State of Virginia. The lien of a judgment under the said chapter 186 of the said Code of 1860 was not confined to the lands of the judgment-debtor in the county, in which the judgment was rendered, but extended and attached to all the lands of the judgment-debtor in any and every county within the State of Virginia. Upon such judgment execution could have been issued directed to the proper officer of any county in the State.

If Calwell owned land in the State of Virginia after the said division said judgments constitute liens thereon, which could be enforced in that State. And said judgments could be revived against Calwell's personal representatives and execution issued thereon in Virginia. I see nothing under the circumstances in the way of this, if it were material. It is true, that after said division writs of execution could not have been issued upon said judgments and directed to the sheriff or other officer of a county in this State; but this was not so, because the judgments were not liens upon the said lands of Calwell in this State, but because no jurisdiction or authority of Virginia after said division had the right or power to exercise jurisdiction or authority within this State or to command or direct any officer of this State to do any act. By the said division the jurisdiction of Virginia became contracted and limited by her then boundaries. Judgments rendered by any competent judicial tribunal in any county of this State prior

to the said division continued to be liens upon the lands of the judgment-debtors in this State and in Virginia after the said division, and this upon the principal, that they were domestic judgments *quoad* the people and territory of each of the States. Judgments rendered in the counties now composing this State by competent authority before the said division have always and in every respect been treated and considered by the courts of this State since the division as domestic judgments in this State; and they are still so considered and treated in every respect, so far as I have knowledge, and upon the principle, on which this is done, the judgments in question are domestic judgments, in so far as relates to the liens thereof upon the lands of said Calwell involved in these suits.

Have the liens of these judgments been discharged or released? I think not, unless it was accomplished by the adoption of the Code of this State of 1868, which, as we have seen, took effect on the 1st day of April, 1869. It is maintained by the counsel for the appellants, that the Code of 1868 did have that effect, when it took effect, if any lien then existed. Without stopping to consider, whether the Legislature could discharge or extinguish the lien of a judgment founded upon contract in any case by statute, I will proceed at once to enquire and consider, whether the proposition of the counsel for appellants is well grounded. Parts of chapter 139 of the Code of 1868 are as follows: "5. Every judgment for money, rendered in this State heretofore or hereafter against any person, shall be a lien on all the real estate, of or to which such person shall be possessed or entitled at or after the date of such judgment, or if it was rendered in court, at or after the commencement of the term, at which it was rendered, except as follows: 6. A judgment rendered before the first day of July eighteen hundred and fifty shall as against a purchaser or creditor claiming under a deed made or judgment obtained before that day, or as against the heirs or devisees of a person dying before that day, affect no more of such real estate than would have been liable thereto under the laws in force at the time such judgment was rendered." And the 8th section provides as follows: "8. The lien of a judgment may always be enforced in a court of equity."

Now it will be observed, that section 5 is in the exact language of the 6th section of chapter 186 of the said Code of 1860. This being so, the reasonable. presumption is in the absence of anything appearing to the contrary, that it was the intention of the Legislature simply to continue the law, as it was, and not to make any change therein. If you give said 5th section a strict technical construction, it will not include judgments rendered in the counties of this State before the division. Such judgments were rendered in the State of Virginia, before this State existed ; and therefore they cannot strictly speaking be judgments rendered in this State. But such was not the intention of the Legislature; and it has never been so considered by any one, so far as I am advised.

Let us consider the said fifth and sixth sections together and see, whether the meaning and intent of the Legislature is not more apparent. What is meant in the 6th section by "a judgment rendered before the 1st day of July, 1850, shall as against a purchaser or creditor claiming," &c., affect no more of such real estate than would have been liable thereto under the laws in force at the time such judgment was rendered. Of course in strictness no such judgment could have been rendered in this State. It manifestly refers to judgments rendered prior to the time, when West Virgnia became a State. But the said 6th section of said chapter 139 is in substance and meaning precisely the same, as the 7th section of chapter 186 of the Code of 1860, which is as follows: "7. A judgment rendered before the commencement of this act shall, as against a purchaser or creditor claiming under a deed made or judgment obtained before the day of such commencement, or as against the heirs or devisees of a person dying before that day, affect no more of such real estate than would have been liable thereto, under the laws in force on the day before this chapter takes effect." It is proper here to say, that said chapter 186 was enacted in the Code of 1849, which took effect on the 1st day of July, 1850. The clear object of said 7th section was to leave the judgment-creditor, who obtained his judgment prior to the 1st day of July, 1850, the same rights and liens as he had under the law prior to that day. Thus we see that sections 5 and 6 and 7 of chapter 139 of the Code of 1868 are in substance the same as sections 6, 7

and 8 of chapter 186 of said Code of 1860, the 5th section of the one Code being an exact copy of the 6th in the other and the 6th in the one being in substance and meaning exactly the same as the 7th section in the other, and the 7th section in the one Code being an exact copy of the 8th in the other. This being true, the reasonable presumption ordinarily in such case is, that the Legislature did not intend to change the law.

But suppose it be admitted, that there may be doubt, as to whether the 5th section of said chapter 139 only comprehends judgments rendered in the State of West Virginia, or that it probably does only comprehend such judgments, if we look alone to said 5th section. If we look at chapter 166 of the Code of 1868, p. 735 (which is the last chapter thereof) we find it enacted in that chapter as follows:  " 1. All the provisions of the preceding chapters shall be in force upon and after the first day of April, eighteen hundred and sixty-nine; and all acts and parts of acts, of a general nature, in force on the day preceding that day, shall stand repealed, subject to such limitations as may be made by law. 2. Such repeal, except where it is otherwise provided in this act, shall not affect any act done, or forfeitures incurred, or any right established, accrued or accruing before the said first day of April, eighteen hundred and sixty-nine, or suit or proceedings pending on that day, save only that the proceedings thereafter had shall conform, as far as practicable, to the provisions of the foregoing chapters of this act."   We have ascertained, that the liens of said two judgments were liens upon the lands of the said Calwell, deceased, involved in these suits prior and up to the said first day of April, 1869; and I apprehend, that there can be no doubt, that said liens were in these cases "accrued rights" at that time, and being so they stand unaffected, and such rights were not intended to be impaired or destroyed by the Legislature in the adoption of said Code of 1868. udge  Burks says expressly in his opinion in the case of *Borst* v. *Nalle et als.,* 28 Gratt. at p. 430, that such a lien is a "civil right"; and all the other judges seem to have concurred in his opinion.

I will now proceed to consider, whether the said two judgments were so docketed in the clerk's office of the county

court of Greenbrier county, as to affect subsequent purchasers for value of the lands involved in these suits or any part thereof without notice. I will consider the objections made by counsel of appellants *seriatim.*

1. It is objected, "that they are not abstracts, but purport on their face to be copies of judgments." It will be seen by reference to the 4th section of chapter 186 of the Code of 1860, that if the judgment is in the county court of the county, of which the clerk required to docket it is clerk, an abstract of the judgment is not required to be delivered to such clerk, that he may docket the judgment; but in that case it is evidently contemplated, that he shall docket it from the record of the judgment in his office on being required to docket the judgment by any person interested. In that case the law supposes, that the clerk has in his custody the recorded judgment of the court, which is all, that is necessary to enable him to docket the judgment in the judgment-docket-book, which he is required to keep in his office. But where the judgment was not rendered in his court, then an authenticated abstract of the judgment or an authenticated copy of the judgment is necessary for the information of the clerk, 1st, as to there being such a judgment, and 2d, to enable him to docket it. While there is a difference between an authenticated abstract of a judgment and an authenticated copy of a judgment, still it must be admitted, that an authenticated copy of a judgment contains all the information and more than an authenticated abstract of the judgment, and is in fact more reliable for the clerk to act upon. An authenticated copy of a judgment for the purpose of said 4th section includes an authenticated abstract, because it contains all such abstract could and more; and in my opinion the requirement of said section is complied with, when an official copy of the judgment is delivered to the clerk instead of an official abstract of the judgment.

2. It is objected, that "the dates of the judgments are not given." I am of opinion, that "March 6, 1860," in the connection and place in which the words and figures are used, do plainly import the date of each of the judgments, and that they import such date so clearly, that no one could be mistaken or misled thereby.

3. It is objected, that the court, in which the judgments were rendered, is not given. The words " Greenbrier county clerk's office, to wit," at the head of one of the copies, and the words, " The State of West Virginia, Greenbrier county, to wit," at the head of the other, were manifestly prefixed by the clerk of the county court of Greenbrier county, as will be at once seen by the words immediatlely following : " In the circuit court of the city of Richmond, March 6, 1860," and what follows in each of said copies. The " circuit court of the city of Richmond" is the court designated by the law. See sections 1 and 2 of chapter 42 of the Code of 1866, *supra.* The law seems to suppose, that that was a sufficient designation of the court without designating, that the city of Richmond was in the State of Virginia.

4. It is objected, that the names of the parties to said judgments are not given. The plaintiff is stated in the first judgment to be the Commonwealth ;" and the defendant is stated to be " Edmund S. Calwell, one of the sureties of John E. Lewis, late shereriff of Greenbrier county. First case upon a motion instituted and prosecuted by the auditor of public accounts." The plaintiff in the second judgment is stated to be " the Commonwealth and the defendant is stated to be Edmund S. Calwell, one of the sureties of John E. Lewis, late sheriff of Greenbrier county, second case upon a motion instituted and prosecuted by the auditor of public accounts." The 4th section of chapter 42 of said Code of 1860, expressly provides, that " every judgment on any such motion shall be in the name of the Commonwealth." So that the name of the plaintiff is given as designated and required by the law, and no one could be misled or deceived as to who was the plaintiff in the judgments.

5. It is objected, that neither of the judgments is properly certified. Each judgment is headed : " In the circuit court of the city of Richmond, March 6, 1860," then the title of each case is given and then the judgment of the court, and at the bottom of the judgments are the words : "A copy teste ;" and then the signature "James Ellet, clerk." These copies are attested in the usual way attestations of such copies are made and are required to be made by clerks in order to be evidence. See section 5, chapter 176 of the Code of 1860, It is true, it

would perhaps have been more satisfactory, if the clerk had appended to his name " clerk of the circuit court of the city of Richmond," but considering the heading to the copy : "In the circuit court of the city of Richmond," &c., and the attestation as it appears, I think it is substantially sufficient to meet the requirements of the statute.

6. It is objected, that " the date of the docketing is not given." The docketing and the date thereof is distinctly stated as to each judgment in these words : " Docketed September 29, 1860."

7. It is objected, that the statute requires, that the different items " shall be stated in separate columns." This raises the question, whether the statute in this respect is mandatory or simply directory. I am of the opinion, that the statute in this respect must be held as simply directory and not mandatory, if for no other reason, because the thing directed to be done in this particular is not the essence of the thing required. Lord Mansfield in *Rex* v. *Loxdale,* 1 Burr. 447 ; Pott. Dwarr. on Statutes, &c., of 1871, 222, 223, 224, 226, notes ; *Marchant* v. *Langworthy,* 6 Hill. 646 ; *Striker* v. *Kelly,* 7 Hill. 9 ; *People* v. *Cook,* 8 N. Y. 67 ; *People* v. *Cook,* 14 Barb. 290 ; *People* v. *Schermerhorn* 19 Barb. 558. In the last case it was held, that a statute is directory, where the thing directed to be done is an immaterial matter, where a compliance is matter of convenience rather than substance. In Dwar. on Statutes at page 226 in a note it is said : "And in general it may be laid down as a rule, that when a statute directs certain proceedings to be done in a certain way or at a certain time, and the form or period does not appear essential to the judicial mind, the law will be regarded as directory, and the proceedings under it will be held valid, though the command of the statute as to form and time has not been strictly obeyed; the time and manner not being the essence of the thing required to be done." This it seems to me states a good general rule upon the subject.

8. It is objected, that the book from which the copies were taken is not such a " well bound book " as the statute requires. The attestation of the clerk of the county court to one of the copies is as follows : "A true copy from *the judgment lien docket,* as it now remains in the clerk's office of

Greenbrier county court," and to the other : "A true copy from the judgment lien docket as it now remains in the clerk's office of Greenbrier county court." I see no substantial difference in the attestations of the clerk ; the only difference is, in the one the words "the judgment lien docket" are italicised, and in the other they are not. The clerk also after his attestive certificate certifies, that the book though old is substantially bound and well preserved for so old a book ; that said book was used for docketing judgments from August 16, 1843, to May 15, 1861, and that he finds one judgment docketed therein the 1st day of May, 1866 ; that there is in the office no other book kept during that time or period for such purpose ; that no judgments were docketed in his office from May 15, 1861, until February, 1866, from which time another book was commenced and used for that purpose ; that the said first book was always treated and used in the office as a judgment lien docket, and was always exhibited as such to any persons wishing to see such a docket for the time, which it covers, and copies from said book were always furnished to persons desiring them certified as from the judgment lien docket. I have doubts, whether portions of these certificates as to facts stated can be proved by a certificate of the clerk, and whether, if such facts are relied on, if deemed material, they should not be proved by deposition. But I do not deem it necessary now to decide that question, as in my opinion the direction of the statute as to "a well bound book," is simply directory as to the quality of the book, and so far as my knowledge extends, it has always been so considered by the legal profession.

9. It is further objected, that neither of said two judgments were indexed. The clerk certifies, that the said two judgments are indexed as follows : " The space in the index under the letter ' C ' is filled up and runs out just where the column for ' E ' begins, and there where the ' C ' space ends and before any indexing under ' E ' is this note, ' See after J ;' and upon the page after the letter ' J ' in the said index the indexing under 'C' is resumed, and after thirty-nine entries in letter 'C' the following are found: *Commonwealth* v. *Calwell*, E. S. '81 ; *Same* v. *Same*, '81." The clerk also certifies, that said judgments are not otherwise docketed than as above. This pre-

cise question was presented to and decided by the Court of Appeals in Virginia in cases, in which the facts appearing were much stronger than in the case at bar. The cases, to which I refer, are *Old Dominion Granite Co. et als.* v. *Clarke et als.; Same* v. *Jones et als.,* 28 Gratt. 617. The syllabus of the cases is: " C. obtained a judgment against B. and P. as partners trading under the firm of B. & Co. He delivered an abstract of his judgment to the clerk of the county court of the county, wherein there was a tract of land belonging to P., and the same was properly entered by the clerk in the body of the judgment-docket, but was not indexed in the name of P., but merely in the name of 'B. & Co.' Subsequently P. sold and conveyed his land to O., who had no knowledge of C.'s judgments. Upon a bill filed by C. to subject the lands in the hands of O. to his judgments, held: That under chapter 186 §§ 4, 8 Code of 1860 indexing was not a necessary part of the docketing." This case was decided in 1877. Judge Staples delivered the unanimous opinion of the court. In this opinion the judge reviews the subject ably and his conclusions and reasoning coincide so nearly with my own, that I repeat so much of his reasoning and conclusions in his language instead of my own. Commencing at page 621 the judge says:

. "Conceding for the sake of argument, it is the duty of the auditor to have his judgment docketed, the question still arises, whether that has not been done in the case before us. As already stated, the abstract of the judgment was properly placed on the judgment-docket, but it was not indexed in the individual name of the defendant, Pate. The point presented is, whether indexing is a part and necessary part of the docketing. In other words, is the docketing incomplete, until the judgment is also properly indexed in the name of the defendants. This question must of course be solved by the provisions of our statute exclusively. The first act passed upon this subject was in April, 1843. A recurrence to that act will very materially aid us in reaching a correct conclusion. The first section provides, it shall be the duty of the clerk of the county court to keep in well bound books a *judgment* docket, in which shall be regularly *docketed* all such unsatisfied final judgments, decrees, &c., as any person interested therein shall

require him to docket. In such book there shall be plainly set down in separate columns, the name, description and residence of the parties, the amount of the debt, costs, &c., appearing in each case, and the amount and date of the credits, if any. We have here plainly pointed out what constitutes a *docket*, and the manner and form, in which it shall be made out, and the facts it is required to set forth for the information of the parties concerned.

"Having thus provided for a docket, the act makes provision for an index as follows: And for the purpose of more convenient reference there shall be made and preserved in the same books a plain and accurate *index* of all judgments, decrees, &c., *docketed*, and every judgment, &c., in the said index shall be set down in alphabetical order the names of the debtors and each of them. The second section provides, that if any clerk shall fail to *docket* without delay in the manner herein prescribed any judgment, &c., which he shall be required to *docket*, or shall fail to make and preserve the index hereby required of him, he shall be liable to the action of the party aggrieved for such damages, as he may sustain thereby. It will thus be seen, that the docket is one thing and the index another and quite a different thing. Nothing can more strongly enforce this distinction than the language of the second section just quoted. The clerk is required to docket only when requested, but it is his duty to index, whether requested or not. While the statute imposes upon the creditor the duty of requiring the clerk to docket the judgment, it imposes no duty upon him with respect to the indexing. With that the creditor need not concern himself. Certainly he is not compelled to make any demand upon the clerk by the express terms of the provision. The sole object of the indexing, as disclosed in the statute, is for the purpose of a more convenient reference, to facilitate the search, to enable parties more readily to find that which is contained in the docket. The index is a guide to the docket; it saves labor and trouble in examining the docket, but is not the docket itself, nor a part of it.

"We come then to the fourth section, which provides 'no judgment or decree shall bind the land against a *bona fide* purchaser for valuable consideration without notice, unless the

same shall be *docketed* in the manner prescribed in the first section.' Now if this section had provided, that the judgment shall not continue a lien unless docketed and indexed according to the first section, the question would be free from difficulty. But it does not say so. The forfeiture results only from a failure to docket; and as we have seen, the docketing is complete without the indexing. If the clerk fails to make the index as prescribed by the statute, and the purchaser is misled, the latter doubtless may have his action for damages. But this is no concern of the creditor. Having docketed his judgment, he may safely leave the rest to the clerk, whose duty as to the index does not depend upon any act or request of the creditor. The provisions found in the revisal of 1849 are substantially the same as the act of 1843. The only difference is, that in the former the revisors omitted the phrase 'for the purpose of more convenient reference.' It is certain, that no material change was thereby intended. It was probably thought these words were unnecessary, and consequently they were left out in conformity with the plan of condensing all the statutes.

"In the discussion of questions of this character little aid is to be derived from the decisions of other States, unless their laws substantially correspond with ours. The statutes of the State of New York are perhaps more nearly like those of Virginia in this particular than those of any other State. The law requires a record-book of all deeds and mortgages, and it further declares, that the clerk shall provide books for making general indices, and shall form indices therein in such manner as to afford convenient and easy reference to the several books of record in their offices respectively. This act was passed about the same time as ours, in the year 1843. In a very recent case—*Mutual Life Ins. Co.* v. *Dake*, reported in the Central Law Journal, 340, of April 13, 1877, the question arose as to the rights of a *bona fide* purchaser as against the lien of a mortgage. There also the purchaser had examined the index, but found no reference to a mortgage, although in fact it was duly recorded. The Court of Appeals held, that the provision in respect to indexing instruments did not show any ground for claiming, that the index should constitute notice. The index was simply required to be attached to each

book; and all this was for the convenience of those searching for records, but was not considered part of the records. Judge Smith, who spoke for all the Judges, in closing his opinion uses the following language: 'On the whole, I am of opinion, that under our statute the index is not an essential part of the record for the purpose of notice; that in this case the plaintiff's mortgage was duly recorded so as to be regarded as giving notice to after-purchasers, and that the lien of the plaintiff's mortgage is superior to that of the Balty mortgage held by the defendant Dake. In reaching this conclusion, I have not overlooked the practical inconveniences, that may result from it in searching records. But the duty of the Court is only to declare the law, as the Legislature has laid it down. Argument *ab inconvenienti* may sometimes throw light upon the construction of ambiguous or doubtful words; but when as here the language of the law makes it plain, they are out of place. Inconvenience in practice will result, whichever way the question shall be decided. The place to remedy them is the the Legislature, and not in the courts. Even as the law now stands, the party injured by the omission of the clerk is not without remedy.' All that is here said is equally applicable to the case before us. Indeed it would be difficult to find an authority more directly in point. Judge Smith further states, that the statutes of Vermont and Missouri are the same in many respects as those of New York, and he relies upon *Curtis* v. *Lyman*, 24 Vt. 338, and *Bishop* v. *Schneider*, 46 Mo. 472, in which the same questions arose, and the same doctrine was affirmed by a unanimous court. See also the recent case of *Chatham* v. *Bradford*, 50 Ga. 327, upon the construction of a statute similar in many of its provisions to the New York statute.

"These cases substantially assert, that the index is no part of the record, but a means of easy reference to the record. If the clerk fails to make the index, he injures those, who desire to make the search. The clerk's duty is therefore to the searcher and to the public, and not to the holder of the deed. When the latter has placed his deed upon the record-book he has done all the law requires him to do. Any one who will take the trouble can examine this record. The time and labor expended in making this examination is merely a ques-

tion of degree. If the party pursuing the search is content with looking at the index, without an examination of the record, and he is thereby misled, his remedy is against the clerk, whose duty it is to prepare the index for the benefit of the searcher, and not of the holder of the deed. These views are not only in conformity with the provisions of our statute, upon a fair and reasonable interpretation, but they are intrinsically just and sensible in themselves. All that is said with reference to the holder of a deed admitted to record, but not indexed, is equally applicable to a judgment-creditor, whose judgment is docketed and not indexed."

In addition to the authorities above referred to on the matter of indexing I refer to the following cases as bearing thereon : *Throckmorton et als.* v. *Price et als.*, 28 Tex. 605 ; *Horsley et als.* v. *Garth & Colquit*, 2 Gratt. 474 ; *Carper et als.* v. *McDowell*, 5 Gratt. 212. Under the circumstances appearing in this case, I think the said judgments and their liens ought to be enforced in equity in favor of the State, and that payment thereof should not be presumed against the State of West Virginia in these causes under the principles hereinbefore announced. *People* v. *Supervisors of Columbia County*, 10 Wend. (N. Y.) 363 ; Angel on Limitations, 6th ed. chapter 5, section 37, note 3, pages 31, 32, 33 ; and other authorities hereinbefore cited. Upon the whole I am of opinion that the appellant's ninth objection is not well taken.

I have now considered and determined all the material questions arising upon the assignments of error of the appellants contained in their petition for this appeal, and, I believe, all, which have been discussed by the counsel for appellants. But the counsel for the State of West Virginia and Tuckwiller have filed and argued some cross assignments of error, which I will consider and dispose of in the order, in which they have been argued before us.

The first of said cross-errors so assigned is the following : " First.—The court erred in permitting the defendants, Caroline Tillman, David Norris, Sally Norris, Anthony Holmes and Nancy D. Tillman, to file amended answers on the 20th day of November, 1878, after all the matters in issue had been decided." The amendment of answers referred to in

this assignment of error as being permitted by the court is the amendment referred to in the clause of the said decree of the 20th day of November, 1878, which is as follows : " And then after the foregoing opinion and decision had been given, the defendants, Caroline Tillman, David Norris, Sallie Norris, Anthony Holmes and Nancy D. Tillman, asked leave to amend the·answers by them heretofore filed in these causes, and leave to do so is granted them accordingly; and said amendments are now here made and the plaintiffs reply generally." What the amendments were does not appear upon ·the face of the decree, but it does appear, that the amendments were then made and as I infer by inserting them in the original answers simply. It does not appear, that any objections or exceptions were made to the making or allowance of said amendments, or what reasons, if any, were assigned, why said amendments were not asked for or made at an earlier period, or why the matter embraced in the amendment was not inserted in the original answers. What the amendments allowed and made as aforesaid were only appears by the notes of the clerk of the court below appearing in the record, in which he states, that the part of the answers in italics constitute. the amendments. It appears, that on the second day after the rendition of said last named decree, to wit: on the 22d day of November, 1878, upon motion of the said Alexander F. Mathews, administrator of P. A. Prindle, and of the State of West Virginia, leave was granted them to file a special replication to the original and amended answers filed in these causes by said Caroline Tillman, David Norris, Sallie Norris, Anthony Holmes, Nancy D. Tillman and Peter Holmes, and said special replication was accordingly filed, which denies all the material allegations contained in said answers and each of them. None of the answers amended were sworn to.

The object and purpose of said amendment was no doubt to raise the question in the cause by evidence as to whether these defendants were entitled as alienees for value of Calwell, the debtor, as they allege, to be allowed in these causes against liens ascertained and adjudicated compensation for the permanent improvements made by them on the parts of the land conveyed to them respectively by said Calwell during his life, after charging them with proper rents and profits, &c. And

perhaps the object of the court in permitting said amend-ments, if its attention was called to their nature at all, was to allow the defendants to raise that question if they could, by evidence, without the court adjudicating or deciding thereby upon the question at that time in any respect, but leaving the question open, undecided and not passed upon by the court. I apprehend, that an order of court permitting the amend-ment of an answer is not appealable. The making amend-ments of answer generally ought not to delay the hearing of a cause as to the questions thereby raised in the pleadings except for good cause.

As the court below in permitting said amendments decided no question or principle in the causes but in effect left any and every point or question, which might or could arise by or under said amendments, open, I do not think this Court is authorized now to reverse the said decree in whole or in part because of said amendments being allowed under the circum-stances, as they appear by the record. To do so would in effect amount to this Court deciding in advance a question in these causes, upon which the court below has never passed and in fact may never be required to decide. Whether the said defandants or any of them as alienees of Calwell for value are entitled as against the lien-creditors of said Calwell to compensation for any improvements of any character, which they may have respectively put upon the lands conveyed to them by said Calwell, or not, in these causes has not yet been decided or passed upon by the court below, nor can nor do I see, that the court below has in any way held or decided in these causes by admitting said amendments or otherwise the principle of law, that a subsequent purchaser of land for value is or is not entitled under any circumstances to have as against judgment-lien-creditors or deeds-of-trust-creditors of his ven-dor, of which he had at the time of his purchase either actual or constructive notice, compensation for improvements, which he put upon the land purchased; and the evidence in the cause upon the subject of said amendments was not sufficient on the 20th day of November, 1878, to have required the court be-low to decide the question of law in these causes and issues upon said answers were afterwards made by special repli-cation. The appeal was prematurely taken in this case, if it

was desired to have this Court pass on the question, as to whether subsequent alienees of Calwell are entitled to compensation for permanent improvements. In affirming the said decree of the 27th of November, 1878, which under my views in these causes must be done, this Court does so with the full understanding and declaration of these facts.

The second assignment of error is, that the court below erred in sustaining the motion of said defendants Caroline Tillman and others for a continuance of these causes. Whether the court below erred in continuing the causes, as to the matters, which it did, as appears by its said decree, it is immaterial and unnecessary here to enquire into or decide, as this Court is not authorized to reverse any part of the decree for that cause, or to give for that cause such decree as the court below ought to have given, if it had then heard and decided the cause. While courts should be careful not to continue causes, when they ought not to be continued, still an order of continuance is not appealable.

The third assignment of error is, that if there was any ground shown for a continuance, it only had reference to the aliened lands. The answer to this assignment of error is the same as that to the second assignment. The fourth error assigned is, that the court erred in sustaining the exception to the report of commissioner Withrow, as far as relates to the debt in favor of Tuckwiller, and in rejecting and disallowing said debt. I have already disposed of this assignment of error by holding, that the court did not err in this respect.

I have now reviewed these causes so far, as decided and passed upon by the court below. I have done so with much labor, examination and consideration ; and my conclusion, for the reasons hereinbefore stated, is, that there is no error in the said decree of the circuit court of the said county of Greenbrier rendered on the 20th day of November, 1878, for which it should be reversed. The said decree must therefore be affirmed, and the said Lee George executor of Edmund S. Calwell, deceased, out of the assets of the said Edmund S. Calwell in the hands of the said George to be administered, and the said Caroline Tilman, Nancy D. Tilman, Susan M. Constable and Truman Skinner out of their own estates must pay to the appellees, the State of West Virginia, and Alexander

F. Mathews administrator of A. P. Prindle, deceased, $30.00 damages and their costs about their defence made in this cause in this Court, and this cause must be remanded to the circuit court of the said county of Greenbrier for further proceedings therein to be had according to the principles settled in this opinion and further according to the rules and principles governing courts of equity.

JUDGES JOHNSON AND GREEN CONCURRED.

JUDGMENT AFFIRMED.    CAUSE REMANDED.